Argued and submitted March 23, reversed June 15, 1981

VAN GORDON,
*Petitioner,*
*v.*
OREGON STATE BOARD OF
DENTAL EXAMINERS,
*Respondent.*

(CA 17215)

629 P2d 848

Don H. Marmaduke, Portland, argued the cause for petitioner. On the briefs were Barbee B. Lyon and Tonkon, Torp & Galen, Portland.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Petitioner seeks review of an order of the Oregon State Board of Dental Examiners (Board) revoking his license to practice dentistry in Oregon on grounds of "unprofessional conduct." ORS 679.140(c). Specifically, the Board found that the petitioner had engaged in a pattern of both overcharging and overtreating patients. Petitioner challenges the Board's order on several grounds. He contends, among other things, that the Board's findings are not supported by substantial evidence, that the Board relied on evidence outside the record and that he was denied due process of law because of the Board's alleged bias against him.[1] We find that the Board's order is not supported by substantial evidence in the record and therefore reverse. ORS 183.482(8)(c).

## HISTORY OF THE CASE

The Board's accusation of unprofessional conduct and notice of proposed license revocation was filed on May 19, 1977.[2] It charged the petitioner with prescribing or dispensing drugs outside the scope of dentistry, obtaining

---

[1] On September 10, 1980, the Board withdrew its order for purposes of reconsideration. ORS 183.482(6). The Board was given until October 30 to either affirm, modify or reverse its order. At the Board's request, we thereafter further extended the time allowed for reconsideration until November 28. The Board did not file its amended order until January 12, 1981. A motion for relief from default was filed two days later. We denied the Board's motion and ordered the appeal to proceed on the Board's original order as though it had never been withdrawn. In his reply brief petitioner contends that, because of its withdrawal by the Board, there is now no valid order from which to appeal. We disagree. Our "reinstatement" of the Board's original order was a functional equivalent of receiving a new order from the Board reaffirming its original decision. ORS 183.482(6). Petitioner made no objection at the time; his brief fully deals with that order. We deem the Board's original order to be properly before us.

[2] After the notice and accusation was filed, petitioner filed suit in Multnomah County Circuit Court requesting that the Board be ordered to grant him more time to prepare for the hearing. The Board subsequently granted petitioner's request, but suspended petitioner's license pending a hearing. The circuit court enjoined the suspension order. Petitioner then requested the court to enjoin the Board from hearing the case on the ground of bias. The circuit court found that the Board was biased and ordered that three senior state judges be appointed to hear petitioner's case. The Board appealed and this court reversed. *Van Gordon v. Oregon State Bd. of Dental Exam.*, 34 Or App 607, 579 P2d 306 (1978), *rev den* 284 Or 235 (1978), *cert denied* 441 US 907 (1979). The hearing before the Board commenced on September 21, 1979.

fees by misrepresentation or fraud and performing unnecessary treatment. Attached to the accusation and incorporated therein were eleven exhibits. Each exhibit referred to one of petitioner's patients. The eleven patients had been examined by three dentists appointed by the Board prior to the issuance of the charges against petitioner. The exhibits detailed the treatment, tooth by tooth, which petitioner claimed on welfare and insurance claim forms that he performed on these patients, and then separately stated the work the examining doctors found had been performed. The exhibits also noted whether pre-treatment x-rays of the particular patient were reviewed by the examining doctors and, where they were, whether the x-rays revealed any evidence of cavities. These exhibits were the basis for the Board's accusation. Supplemented by the testimony of one of the examining doctors and evidence of certain patients' conditions as revealed by pre-operative and/or post-operative x-rays, they also form the basis of the Board's final order.

The charge of prescribing or dispensing drugs outside the scope of dentistry was unsupported by the evidence, and the hearings officer ordered that charge dismissed at the close of the hearing. As to the remaining charges, the Board made specific findings concerning each patient. In the cases of two patients, the Board found that the evidence did not sustain the charges. With respect to the other nine patients, and in accordance with the original accusation exhibits, the Board detailed certain work that it found had not been done. These findings support the Board's general finding of overcharging or obtaining fees by misrepresentation. In three of these cases the Board also found that there was no evidence of cavities and that restorations were made on healthy teeth. These findings support the Board's general finding of overtreatment or performing unnecessary treatment.

## TERMINOLOGY

The technical nature of the claims and the evidence in this case makes it necessary to review briefly the basic structure of the mouth and the individual tooth. An adult has a maximum of 32 teeth. A child has 20. Dentists refer to permanent or adult teeth by the numbers 1 through 32. Tooth No. 1 is in the upper jaw, right side at the back.

The tooth next to and just in front of it is No. 2, and so on. Tooth No. 16 is on the left upper side at the back. The lower teeth are numbered 17-32 from back left to back right. The 20 deciduous, or baby teeth, of a child are designated by the letters A through T in a similar fashion.

By tradition the dental profession treats an individual tooth as though it were a cube with five observable sides. The top or chewing surface of the tooth is the "occlusal" surface. The side of the tooth nearest the midline of the mouth (the front of the tooth) is the "mesial" side of the tooth; the back surface of the tooth furthest from the midline of the mouth is the "distal" side. These surfaces, the surfaces closest to the adjacent teeth, are also known as the "interproximal" or "proximal" surfaces. The side of the tooth next to the cheek is the "facial" side, and the side nearest the tongue is the "lingual" side. These sides or surfaces are represented by symbols: O for occlusal, M for mesial, D for distal, F for facial, L for lingual. The symbols, typically used in the sequence of MODFL, are used by dentists in patient charts and other records to identify that portion or side of the tooth needing repair or which has been restored, and for other purposes. With this nomenclature in mind, we turn to the specific claims before us.

## OVERTREATMENT

The Board concluded that the evidence as a whole "reveals a pattern of * * * overtreatment." "Overtreatment" is defined by the Board to mean "that there were no caries [*i.e.,* cavities], decalcification or other fault with the tooth which required restorative work." The Board made the following specific findings:

"Exhibit 1, Robert Doughty:

"(a) The Board finds that there were no interproximal caries evident.

"(b) Accordingly, restorations were made on healthy teeth.

"* * * * *

"Exhibit 2, Wendy Doughty:

"(a) No evidence of interproximal cavities.

"(b) That restorations were made on healthy teeth.

"* * * * *

"Exhibit 4, Brian Arent:

"* * * * *

"(b) There were patent violations of healthy teeth in numbers three and four.

"* * * * *"

Petitioner's first contention concerning the Board's finding of overtreatment is that, because the accusation did not charge him with treating Brian Arent unnecessarily, the Board erred in making that finding. The Board concedes error as to Brian Arent. Therefore, only two instances of allegedly unnecessary treatment, *viz.,* the treatment of Robert and Wendy Doughty, require further scrutiny.

It is undisputed that the pre-operative x-rays of the patients Robert and Wendy Doughty do not reveal any interproximal cavities, *i.e.,* cavities on the surfaces between the teeth. There is also no question that petitioner, in fact, placed fillings in the interproximal spaces of the teeth under examination. However, the dentists who testified at the hearing agreed that x-rays do not reveal all the decalcification or decay which may exist in an individual's mouth. For example, x-rays are not particularly useful for diagnosing decay on the occlusal surface of the tooth; neither will they pick up signs of decay where teeth overlap each other. Most importantly, x-rays will not pick up early or shallow decay which takes place in the outer (enamel) layer of the tooth. This is called "decalcification." It is only when decay reaches the second (dentine) layer of the tooth that x-rays will reveal decay. Early decay or decalcification may, however, be noticed upon clinical examination and with the aid of a special instrument known as an "explorer." The expert testimony at the hearing indicated that a thorough dental examination consists of much more than just the taking of x-rays; an actual examination of the patient's mouth is necessary.

There was some disagreement among the dentists testifying as to whether and in what cases this shallow decay should be filled. However, that was not the issue before the Board. The issue was whether any evidence of decay existed at all. The dentists who examined the pre-operative x-rays testified that no cavities were visible from the x-rays but agreed that this did not necessarily mean that there were no interproximal cavities or decalcification. The Board itself found that

"[i]t was acknowledged by all of the testifying dentists that x-rays, alone, are not sufficient to fully describe * * * preoperative evaluations. * * * [An] examination of the actual mouth [is required] to fully determine the extent of * * * the need for restoration * * *."

The x-ray evidence was the only evidence supporting the Board's findings. In view of the Board's own acknowledgment concerning that evidence, there is no "substantial" evidence to support the finding that cavities did not exist.

## OVERCHARGING OR MISREPRESENTATION

Petitioner is charged with submitting claims to Welfare and Blue Cross for restoring more surfaces on certain teeth than were actually involved in a given restoration. The Board defines "overcharge" in its final order "as a charge made for work on a side of a tooth that simply was not done."

As earlier noted, dentists typically describe the work they perform on a given tooth according to the surfaces involved. The tooth itself is identified by its position or number in the mouth. For example, if a dentist filled a cavity on the mesial, occlusal and distal surfaces of the back upper right tooth, the procedure would be described as a #1-MOD filling or restoration. If all five surfaces were treated it would be an MODFL. The fee for a restoration is usually predetermined, and is equal for each surface. The total fee for any given tooth depends upon the number of surfaces involved. In billing the Department of Welfare and private insurance carriers, a dentist submits a claim statement detailing the exact work performed and he is then reimbursed accordingly. Welfare and many insurance carriers, including the one involved in this case, will not pay for more than four sides; therefore, a restoration on five sides will be reimbursed to the same extent as a four-sided restoration.

All the disputed fillings in this part of the Board's findings were facial or lingual fillings. There are two different ways in which petitioner's claims for payment for work allegedly done on facial and lingual surfaces became an issue: (1) petitioner claimed work on these surfaces in conjunction with restoration on a distal or mesial surface, essentially claiming that his treatment had gone "around

the corner" to the lingual or facial surface, and (2) petitioner claimed work on lingual and facial surfaces when restorative work on the occlusal (chewing) surface of the tooth extended over the side of the tooth into one of the lingual or facial 'grooves' of the tooth. The eleven exhibits attached to the accusation and set out in the margin clarify the dispute.[3]

---

[3] The first column on the following exhibits represents the work claimed to have been performed by the petitioner. The second column is the work the examining doctors, appointed by the Board, found to have been done. The x's represent the teeth where discrepancies were found.

"(1) Robert Doughty - Welfare

| Treatment charged on Welfare form | | | | Treatment performed or visible in mouth |
|---|---|---|---|---|
| #1 | MOD | base | | MOD |
| #J | MODFL | " | | MOD x |
| #14 | MODL | " | | MO x |
| #K | MODL | " | | MOD x |
| #L | MODL | " | | MOD x |
| #19 | MOFL | " | | MO x |
| #S | MODL | " | | MOD x |
| #T | MODFL | " | | MOD x |
| #30 | MODFL | " | | MO x |

"(2) Wendy Doughty - Welfare

| #1 | MOD | base | | MOD |
|---|---|---|---|---|
| #J | MOF | " | | MO x |
| #J | DOL | " | | DOL |
| #K | MODL | " | | MOD x |
| #L | MODL | " | | MOD x |
| #A | MODL | " | | MOD x |
| #B | MODL | " | | MOD x |
| #S | MODL | " | | MOD x |
| #T | MODL | " | | MOD x |

"(3) Deborah Grenia - Welfare

| Treatment charged on Welfare form | | | Treatment visible in mouth |
|---|---|---|---|
| #32 | MODFL | | x MOD |
| #7 | post for crown | | x No post (film taken) |
| #13 | MODL | | x MOD |
| #14 | MODFL | | x MODL |
| #15 | MOFL | | x MOL |
| #20 | MOD | | MOD |
| #21 | MOD | | MOD |
| #17 | OLFF | | O with 2 fingers following out facial grooves, no L. |

"(4)  Brian Arent - Welfare

| Treatment charged on Welfare form | Treatment visible in patient's mouth |
|---|---|
| #6  M, B Comp | BM comp. |
| #7  MB and DL | MBandDL |
| | (slight extension onto facial surface) |
| #8  M and D | MOD |
| #3  MOFL | x MD - no apparent caries |
| #4  MODL | x MOD " " |
| #5  DOL | x DO |
| #18  OFL | x O |
| #18  MFD comp | x F comp. (small pit) |
| #20  MFD comp | x F comp. (small pit) |
| #28  maximum fee comp | x F comp. (small pit) |
| #29  "      "      " | x F comp. (small pit) |
| #30  "      "      " | x F comp. (small pit) |
| #31  "      "      " | x F comp. (small pit) |
| #14  "      "      " | x F comp. (small pit) |
| #20  MO and DOL | x MOD no apparent caries |
| #21  MODL | x MOD - no apparent caries |
| #30  MODL | x MOD |

"(5)  Yvonne Arent - Welfare

| Treatment charged on Welfare form | Treatment visible in patient's mouth |
|---|---|
| #3  DL | OL |
| #3  MOF | MD x no caries visible on film |
| #30  MODL | MOD x "  "  "  "  " |
| #19  MOLF | MO x "  "  "  "  " |
| #12  DOL | DO x "  "  "  "  " |
| #13  MODL | MOD x "  "  "  "  " |
| #14  MOFL | MOL - M caries "  "  " |

"(6)  Bobbie Roberts [Board found no evidence to sustain the accusations made as to this patient.]

"(7) Terry Travis - Welfare

| Treatment charged on Welfare form | Treatment visible in patient's mouth |
|---|---|
| #A  MOF | ................................................... x MO -<br>no caries on film |
| #B  DOL | ................................................... x DO<br>                                  "    "    "    " |
| #I  DOL | ................................................... x DO<br>"   "   "   " |
| #J  MOFL | ................................................... x MO<br>"   "   "   " |
| #K  MOFL | ................................................... x MOL<br>caries shows on film |
| #L  DOFL | ................................................... x DO<br>"   "   "   " |
| #S  DOL | ................................................... x DO<br>film of poor quality no apparent caries |
| #T  MOFL | ................................................... x MO<br>film of poor quality no apparent caries |

"(8) Vincent Olmstead [The Board found no evidence to sustain the accusations as to this patient.]

"(9) Kelli Gardner - Blue Cross

| Treatment charged on insurance form | Treatment visible in mouth |
|---|---|
| #2   MODFL alloy crown | ................................................... x MODF<br>replaced DF cusp, other cusps intact. |
| #3   MODFL | ................................................... x MODL |
| #4   MOD | ................................................... MOD |
| #5   MOD | ................................................... DO |
| #12 DOL | ................................................... x DO |
| #13 MOD | ................................................... MOD |
| #14 MODFL | ................................................... x MODL |
| #15 MODFL alloy crown | ................................................... MODFL<br>both M cusps intact. |
| #18 MOFL alloy crown | ................................................... x MOF |
| #19 MODL | ................................................... x MOD |
| #28 MO and DO | ................................................... MO & DO |
| #29 MOD | ................................................... MOD |
| #30 MODL | ................................................... x MOD |
| #31 MOFL | ................................................... x MO |

"(10) Paul Pflug - Blue Cross

| Treatment charged | Treatment visible |
|---|---|
| #3   MOF | ................................................... MO x |
|     OL | ................................................... OL |
| #14 MODFL | ................................................... MOx & DOL |
| #19 MODL | ................................................... MOD x |
|     F Comp | ................................................... F Comp. |
| #30 MODL | ................................................... MOD x |
|     F Comp | ................................................... F Comp. |

At the hearing, petitioner claimed that whether or not a given restoration turned a corner is a matter of professional interpretation or judgment. The Board rejected that contention, stating:

"* * * [I]n each instance where precise evidence is available to it, either by the picture slides, accepted and believed evidence of the examining dentists, the x-rays and testimony of the accused, the Board is convinced that it is not a question of interpretations or judgment, as claimed by the accused[;] some of the work, for which fees were claimed and paid, was simply not done. The Board believes these facts to be clear and obvious to an extent sufficient to cast doubt on the integrity of all of the accused's testimony.

"* * * * *

"Conversely, all of the professional members of the Board in the exercise of their statutory function and utilizing their own knowledge to evaluate the evidence find no reason to doubt the testimony of the examining dentists in regard to their physical examination of the several persons' teeth involved.

"The x-rays and picture slides fully corroborate the latter testimony, and they refute the testimony of the accused, both as to the quantity and quality of the work performed."

---

"(11) Julianna Pflug - Blue Cross

| Treatment charged | | Treatment visible |
|---|---|---|
| #2 | MOFL | MO x |
| #3 | MOF | MO x |
| | DOL | DOL |
| #4 | MODF | MOD x |
| #5 | MOD | MOD |
| #6 | DL | DL |
| #12 | MOD | MOD |
| #13 | MOD | MOD |
| #14 | MODFL | MODLx |
| #15 | MODFL | MOD x |
| #18 | MODL | MOD x |
| #19 | MODL | MOD x |
| #20 | MODF | MOD x |
| #21 | MOD | MOD |
| #28 | DO | DO |
| #29 | MOD | MOD |
| #30 | MODL | MOD x |
| #31 | MOFL | MO x |

The Board then made the following specific findings of fact "as identified in the accusatory exhibits * * *."

"1.    Exhibit 1, Robert Doughty:

"* * * * *

"(c)    There were no lingual or facial extensions on teeth number J, 14, K, 19, S, T.

"2.    Exhibit 2, Wendy Doughty:

"* * * * *

"(c)    That there were no lingual extensions on teeth 15, L, A, B, S, T.

"3.    Exhibit 3, Deborah Grenia:

"(a)    That facial extensions are not found in teeth 14, 15, 32, and no lingual extensions in tooth 13.

"4.    Exhibit 4, Brian Arent:

"* * * * *

"(c)    There were no lingual or facial extensions in teeth 27, 28, 29, 30, 31.

"(d)    The Board considers that the restorations in teeth 3, 4 and 5 to have been patent evidence of charging fees for work not done.

"5.    Exhibit 5, Yvonne Arent:

"(a)    There were patently no lingual or facial extensions in teeth, 3, 14, 12, 13.

"* * * * *

"7.    Exhibit 7, Jerry Travis:

"(a)    There were no lingual or facial extensions in any of the teeth as claimed by the accused.

"* * * * *

"9.    Exhibit 9, Kelli Gardner:

"(a)    That there were no lingual or facial extensions in teeth 3, 12, 14, 18, 19, 30, 31.

"10.    Exhibit 10, Paul Pflug:

"(a)    That there were no facial or lingual extensions in teeth 14 and 19.

"11.    Exhibit 11, Julianna Pflug:

"(a)    There were no lingual extensions in teeth 4, 15, 18, 19, 30 and 31.

"(b)    There were no facial extensions in teeth 2, 3, 14, 15, 20, 31."

■■    Petitioner challenges these findings in several respects. Initially, he challenges specific findings as to particular teeth, dividing this claim of error into five

categories. In the first category are extensions which peti-
tioner never claimed that he did. In the second category are
extensions which even the examining doctor who testified
at the hearing found to be legitimate. The state concedes
error as to the findings in both of these categories. The last
three categories involve admittedly disputed restorations.
The dispute, however, is between whether the restoration
was four-or five-sided. In such a case, as petitioner cor-
rectly points out, there can have been no material misre-
presentation by petitioner because the same fee would be
received for a five-sided restoration as a four-sided one. The
particular extensions or findings by the Board which are
therefore eliminated are set out in the margin.[4]

---

4

"Category I

"2.  Exhibit 2, Wendy Doughty:

"* * * * *

"(c) That there were no lingual extensions in teeth 15.

"4.  Exhibit 4, Brian Arent:

"* * * * *

"(c) There were no lingual extensions in teeth 27, * * * 31.

"11. Exhibit 11, Julianna Pflug:

"(a) There were no lingual extensions in teeth 4 * * *.

"Category II

"5.  Exhibit 5, Yvonne Arent:

"(a) There were patently no lingual * * * extensions in teeth 3, 14 * * *.

"7.  Exhibit 7, Jerry Travis:

"(a) There were no lingual * * * extensions in any of the teeth as claimed by the accused [which included tooth #K].

"9.  Exhibit 9, Kelli Gardner:

"(a) That there were no lingual * * * extensions in teeth 3, * * * 14 * * *.

"10. Exhibit 10, Paul Pflug:

"(a) That there were no * * * lingual extensions in teeth 14 * * *.

"Category III

"3.  Exhibit 3, Deborah Grenta [sic]:

"(a) That facial extensions are not found in teeth 14 * * *.

■ As to the remaining findings, petitioner next claims that the Board erred in relying on evidence outside the record to make them. The eleven patients in question were examined by three dentists appointed by the Board. The findings of these doctors are revealed in the accusatory exhibits. The results of their examinations were also communicated to the Board during the investigatory stage of this proceeding. Only one of the dentists who examined the mouths of the eleven patients later testified at the hearing. However, it is clear from the language used in the Board's order that the Board relied on the opinion of all three dentists, as well as relying upon the accusatory exhibits.[5]

---

"Category IV

"4.  Exhibit 4, Brian Arent:

"* * * * *

"(c) There were no lingual or facial extensions in teeth * * * 30.

"Category V

"10.  Exhibit 10, Paul Pflug:

"(a) That there were no facial * * * extensions in teeth 14 * * *."

[5] The Board's order states, in pertinent part:

"When this matter was under investigation, the mouths of the eleven persons listed in the exhibits were examined by three qualified dentists. The examining dentists also examined the accused dental charts relating to the eleven persons and all x-rays available. The findings of the examining dentist became the basis for the accusations contained in the eleven exhibits.

"Reference to the eleven exhibits attached to the accusation disclose two columns. The first column is designated as 'Treatment charged on Welfare form,' etc. Each tooth for which a restoration was claimed was identifed by either a letter (child's tooth) or a number (adult tooth) and the work claimed to have been done on each tooth so identified. In the opposite or second column is the accusation by the examining dentists as to their findings of work alleged to have been actually done. Where the examining dentists found that work claimed for could not be observed in the mouth or by x-rays a small 'x' mark was made. Each item that is marked with an 'x' becomes, therefore a specific accusation of a fee claimed for work not done.

"* * * * *

"General Findings:

"The Board finds that the accumulative weight, believability, and trustworthiness of the evidence submitted and analyzed reveals a pattern of * * * overcharging * * * to an extent that it could not be deemed unintentional. That in each instance where precise evidence is available to it, either by the picture slides, *accepted and believed evidence of the examining dentists,* the x-rays and testimony of the accused, the Board is convinced that it is not a question of interpretations or judgment, * * *.

The exhibits were not offered and admitted in evidence. Therefore, the Board improperly relied upon evidence outside the record in reaching its decision. *See* ORS 183.450 (2).

Given the errors identified above and this reliance on outside evidence, it is clear that the Board's order cannot stand. We must now determine if the case should be remanded for reconsideration and a new order, or be reversed outright. This determination depends upon the resolution of certain of petitioner's other arguments concerning the evidence.

## OTHER EVIDENTIARY CONSIDERATIONS

As noted, petitioner claims that whether a restoration extends onto the lingual or facial surfaces of a tooth is a matter of judgment. All the dentists testifying at the hearing agreed that there is little problem in labeling or "calling" a restoration when only the occlusal, mesial or distal surfaces are involved. In such cases there is little room for judgment. The problem arises in determining when a restoration goes beyond these surfaces to include either or both the facial and lingual sides. The source of the problem is obvious: a tooth is not square, but rounded.

Petitioner's particular approach to determining how many surfaces are involved in a restoration is set out in the margin.[6] Dr. Hart, the Chief Dental Consultant to

---

"Conversely, all of the professional members of the Board in the exercise of their statutory function and utilizing their own knowledge to evaluate the evidence find no reason to doubt the testimony of the examining *dentists* in regard to *their* physical examination of the several persons' teeth involved. * * *" (Emphasis supplied.)

[6] Petitioner testified that he learned to take a strict approach to recording restorations when he was receiving training at an Air Force hospital. He stated that he learned to record another surface whenever the preparation and therefore the restoration went beyond the ideal preparation, even though it did not actually go over the edge of the surface. As he stated:

"The stand they took at the hospital was that anything inside of the preparation which was of a textbook nature, the ideal prep, that caries didn't dictate to you would be considered an MOD, would be within the boundaries.

"Any time it flared out and was—undercut or flared out and involved the integrity of the cusp, they elected to have it recorded as a facial surface, as an MODF or an MODL. * * *

the Welfare Department for the State of Oregon, testified that the petitioner discussed his methods of treating patients and labelling restorations with him. This discussion took place soon after the original accusation was filed against petitioner. Dr. Hart indicated that he told the petitioner that his methods were acceptable to the Welfare Department. He also noted that he knew of no fixed or absolute rule that limits or determines when a facial or lingual surface may properly be said to be involved in a restoration. In Dr. Hart's view, it is a matter of judgment. Dr. Thompson, who is employed by the Veterans Administration, agreed with Dr. Hart.

The Board made no reference in its findings to the opinions of Drs. Hart and Thompson, but instead relied on the opinion and findings of Dr. Quinn. Dr. Quinn was one of the dentists who actually examined the mouths of the eleven patients in question. He indicated that, at the Board's request, he and another dentist compared petitioner's claim forms with the actual work they observed in each patient's mouth. He noted the discrepancies, as revealed in the accusatory exhibits, which they found.[7] Dr. Quinn testified that both he and the other dentist examined the petitioner's work and came to the same conclusions independently.

---

"* * * * *

"My fee schedule states right on it—* * *. I have stated a statement right at the bottom—always have and I still do—that any time the prep exceeds what a normal prep is, any time it involves the inegrity of cusps or cuspal line angles, I reserve the right to charge for that surface if I feel right in doing so. I don't always do it, but I reserve that right, * * *.

"In our office, a three surface alloy becomes a four surface alloy if any cusp and/or cuspal line angle is involved beyond what would be a normal ideal interproximal extension and/or if any occlusal facial or occlusal lingual groove is followed out to the extent of being more involved than a typical pit and fissure-type restoration. In such cases, additional fees may be charged as per our office listed fees."

As best as we can glean from the record, the cusp or cuspal line angle is the area which straddles the corner between two surfaces. The dictionary defines it as "a point or projection on the occlusal surface of a tooth." Webster's 3rd International Dictionary, 1976. Apparently, petitioner added an additional surface any time the preparation and, hence, the filling extended into this area.

[7] *See* n 3, *supra.*

In Dr. Quinn's view there is a very narrow area, as opposed to a line, between the end of one surface and the beginning of another surface of a tooth. He agreed that difficulty arose most often when trying to determine if the lingual and/or facial sides were involved in the restoration. He stated that in the cases he examined any doubt was resolved in favor of calling it an additional surface, even though he might have called it differently in his own practice. He indicated that the fillings themselves were well done and not overextended. On cross-examination and examination by the Board, Dr. Quinn stated that in his own practice he allows quite a large extension into another surface before calling it another surface. He admitted that other dentists might take a different approach. He nevertheless maintained that the area of dispute is very narrow.

The Board also relied upon post-operative x-rays of the patients under examination to support the claims of overcharging or fraud. However, the testimony and the Board's own findings indicate that, because x-rays are only two dimensional, it is difficult to tell exactly what restorations are there. Dr. Quinn stated that it cannot be determined for certain whether facial or lingual surfaces are involved in a restoration just from examining the patient's x-rays.

The evidence presented at the hearing focused on the degree of judgment involved in determining whether a restoration involved the facial and/or lingual surface. Apparently, the Board believed that the disputed area is small and that the petitioner had overstated his restorations and, hence, his charges. We think that this focus misses the point.

■ ■ In a license revocation proceeding based on fraud or misrepresentation, the Board has the burden of establishing the existence of fraud by clear, satisfactory and convincing evidence. *Bernard v. Bd. of Dental Examiners,* 2 Or App 22, 465 P2d 917 (1970). In order to establish actionable fraud, the Board must prove the following elements:

"1.  A representation;
"2.  Its falsity;
"3.  Its materiality;

"4. The speaker's knowledge of its falsity or ignorance of its truth;

"5. His intent that it should be acted on by the person and in the manner reasonably contemplated;

"6. The hearer's ignorance of its falsity;

"7. His reliance on its truth;

"8. His right to rely thereon;

"9. His consequent and proximate injury." *Webb v. Clark,* 274 Or 387, 391, 546 P2d 1078; *Myers v. MHI Investments, Inc.,* 44 Or App 467, 606 P2d 652, *rev den* 289 Or 107 (1980).

In this case there is no evidence that the petitioner misrepresented his charges to either the Welfare Department or Blue Cross, the private insurance carrier.

All the charges in question were made to either Welfare or Blue Cross. Dr. Hart testified that Welfare accepted the petitioner's approach to determining when another surface was involved in a restoration. Dr. Quinn testified that in his opinion the petitioner's restorations did not extend as far as petitioner claimed. However, there is no evidence that petitioner's restorations were not in accordance with his personal approach, as explained to and accepted by Dr. Hart. Dr. Quinn did not contend that the claimed restorations went beyond the standards petitioner followed and communicated to Welfare. Thus, there is no evidence that petitioner misrepresented his charges to Welfare.

Petitioner claimed that he followed this approach with respect to all his patients and their insurance carriers. The Board failed to introduce any evidence that Blue Cross did not accept petitioner's method of labeling restorations.

The Board has failed to carry its burden of proof. There is simply no evidence of misrepresentation or fraud. The Board seems to disapprove of petitioner's method of labeling restorations and therefore his method of determining charges. That, however, is not the issue. No claim was made, and the Board made no finding, that petitioner's method of determining the sides involved in a given restoration was fraudulent in and of itself.

There is no evidence to support either the charge of over-treatment or overcharging. Therefore, the Board's order must be reversed.[8]

Reversed.

---

[8] Because of our disposition of this case, it is not necessary to discuss petitioner's other assignments of error.