Argued and submitted October 15, 1998, affirmed March 17, 1999

## James D. GALLANT, M.D.,
*Petitioner,*

*v.*

## BOARD OF MEDICAL EXAMINERS,
*Respondent.*

(CA A98973)

974 P2d 814

Win Calkins and Eric S. DeFreest argued the cause for petitioner. With them on the brief was Calkins & Calkins.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Petitioner seeks review of a final order of the Board of Medical Examiners (Board). ORS 183.482. The Board found that petitioner had committed an "unprofessional or dishonorable" act, in violation of ORS 677.190(1)(a), when he performed active euthanasia, or a "mercy killing," on a patient.[1] Petitioner makes seven assignments of error, only two of which require discussion. Those two assignments concern whether the Board correctly applied the preponderance of the evidence standard of proof and whether the Board impermissibly allowed a disqualified Board member to participate in the deliberations of petitioner's case. On review for substantial evidence and errors of law, we affirm. ORS 183.482(8).

We state the facts as the Board found them. In the early morning hours of March 22, 1996, a 78-year-old woman awoke with a terrible headache. She called for emergency assistance and collapsed while on the phone. When the paramedics arrived, they found her unconscious on the floor of her bedroom and tried to revive her. She did not respond to their efforts. The paramedics then inserted a tube into her throat to help her breath and took her to the hospital.

An emergency room doctor examined the woman (patient) and, based on her symptoms, ordered a CT scan and consulted with a neurosurgeon about the results. The neurosurgeon told the doctor that patient had suffered a severe brain hemorrhage that would soon end her life. The doctor then called petitioner, who had been patient's primary physician since 1990. When petitioner arrived, he learned that his patient's condition was terminal.

Patient's daughter also had arrived at the hospital. At the time, she was working as an attending nurse in an intensive care unit of a hospital in Portland. She and petitioner discussed the gravity of patient's situation and decided, based on patient's previously expressed end-of-life wishes, to discontinue all artificial life support methods and

---

[1] We note that this case in no way concerns Oregon's Death with Dignity Act. ORS 127.800 *et seq.*

to provide patient with comfort measures.[2] As a result, petitioner ordered that patient's breathing tube be removed and that patient be provided Valium and morphine for pain relief. Petitioner expected patient to "die within minutes[,]" but to his surprise, she did not.

Petitioner then left patient in the care of a nurse and patient's family members and went to his office to meet with other patients. He continued to communicate by telephone with the attending nurse, who advised him of patient's condition. Throughout the morning, patient continued to breathe on her own, though her respiration was described as "agonal."[3] At 10:30 a.m., the nurse called petitioner to tell him that patient's daughter had requested the deactivation of patient's pacemaker. Daughter felt that the pacemaker was an artificial means of life support and thus contrary to her mother's end-of-life wishes. Petitioner told the nurse that he did not know how to deactivate a pacemaker and that its deactivation probably would not make a difference in any event. The nurse then suggested that a magnet could be placed over the device to deactivate it. Petitioner approved that method, and it was used; the pacemaker slowed, but did not stop.

At around 11:15 a.m., the nurse again called petitioner to report that patient's family members were concerned that patient was suffering needlessly. The nurse asked petitioner if there was anything more they could do for patient. Petitioner responded that there was nothing more to do and told the nurse to move patient from the emergency room to a room "upstairs" to make her more comfortable. The nurse then suggested that "sometimes Succinylcholine is used in these situations." Initially, petitioner was hesitant

---

[2] On several prior occasions, patient had discussed with her daughter and with petitioner her desire that, in the event that she became terminally ill, she did not want her life prolonged through artificial or extraordinary means. On one occasion, patient and petitioner reviewed a document called an "Advance Directive" that she had filled out and initialed in several places. That document clarified her position on artificial life support in terminal situations, like the one here, and indicated that she desired intravenous medication only for comfort. Further, that document authorized her daughter to act as her "health care representative" in situations where she was unable to communicate.

[3] This term is defined as "[r]elating to the process of dying or the moment of death[.]" *Stedman's Medical Dictionary*, 34 (23rd ed 1976).

about using that drug, noting that he had never used "it in th[at] way." The nurse insisted, however, stating that he had used it before in similar situations. Petitioner then approved the drug's use, directing the nurse to consult with the emergency room doctor about the proper dosage. Petitioner believed the use of Succinylcholine was consistent with the wishes of patient and her family.

Succinylcholine causes complete muscle paralysis, including the respiratory muscles. It is almost never used in the absence of artificial respiration and is not used as an end-of-life comfort measure. The Physician's Desk Reference contains the following warning:

> "Succinylcholine should be used only by those skilled in the management of artificial respiration and only when facilities are constantly available for tracheal intubation and for providing adequate ventilation of the patient, including the administration of oxygen under positive pressure and elimination of carbon dioxide. The clinician must be prepared to assist or control respiration."

Petitioner knew that the use of Succinylcholine without assisted breathing would cause patient's death; notwithstanding, he did not order that patient receive artificial respiration. A short time later, the nurse called petitioner to inform him that patient had died. Approximately three weeks later, the hospital where petitioner treated patient contacted the Board.

After a hearing and review by the Board, the Board concluded that petitioner's conduct constituted "unprofessional or dishonorable conduct" in violation of ORS 677.190(1). The Board disciplined petitioner by formally reprimanding him, suspending his license to practice medicine for 60 days and ordering him to pay the costs of the disciplinary proceedings. Petitioner petitions for review of that order.

The first question we address is whether the Board correctly applied the preponderance of the evidence standard of proof in determining whether petitioner's conduct violated ORS 677.190(1). A disciplinary action taken by the Board is a contested case and subject to the procedures prescribed by ORS 183.310 to ORS 183.550, the Administrative Procedures

Act (APA). ORS 677.200. We have held that the burden of proof in an administrative hearing "is by a preponderance of the evidence in the absence of some legislative adoption of a different standard." *Sobel v. Board of Pharmacy*, 130 Or App 374, 379, 882 P2d 606 (1994), *rev den* 320 Or 588 (1995); *OSCI v. Bureau of Labor and Industries*, 98 Or App 548, 555, 780 P2d 743, *rev den* 308 Or 660 (1989); *Automotive Technology v. Employment Division*, 97 Or App 320, 323, 775 P2d 916, *rev den* 308 Or 592 (1989); *Metcalf v. AFSD*, 65 Or App 761, 765, 672 P2d 379 (1983), *rev den* 296 Or 411 (1984). However, in determining that the preponderance standard applied in those cases, we did not interpret directly, or rely on, any statutory or constitutional provision, apparently assuming that the legislature intended the usual civil standard to apply in the absence of legislation to the contrary. *See Sause Bros. v. Employment Div.*, 28 Or App 285, 287, 559 P2d 531 (1977) (so stating in a case before the Employment Appeals Board); *see also Sobel*, 130 Or App at 379 (so stating in a case before the Board of Pharmacy). As explained below, and contrary to petitioner's position, we hold that those cases correctly concluded that the statutorily prescribed standard of proof is the preponderance of the evidence standard.

■■   In directing that an agency's decision must be "supported by, and in accordance with, reliable, probative and substantial evidence[,]" ORS 183.450(5) provides that some quantum of proof is necessary to support an agency's decision. *Steadman v. SEC*, 450 US 91, 98-102, 101 S Ct 999, 67 L Ed 2d 69 (1981).[4] That statute therefore prescribes a standard of proof because it sets the specific quantity of evidence necessary to establish an allegation. *Cook v. Michael*, 214 Or 513, 526-27, 330 P2d 1026 (1958). Here, the problem is that ORS 183.450(5) does not prescribe a standard of proof in the

---

[4] In *Steadman*, the United States Supreme Court interpreted precisely the language at issue here and determined that it "established * * * the traditional preponderance-of-the-evidence standard[ ]" for proceedings under the federal APA. 450 US at 98-102. That case, however, is not controlling here as evidence of legislative intent because it was decided well after the original passage date of ORS 183.450(5). *See State v. Cooper*, 319 Or 162, 167-68, 874 P2d 822 (1994) (holding that, "[w]hen the Oregon legislature adopts a statute modeled after another jurisdiction, an interpretation of that statute by the highest court of that jurisdiction that was rendered in a case before adoption of the statute by Oregon is considered to be the interpretation of the adopted statute that the Oregon legislature intended").

usual terms of preponderance, clear and convincing, or reasonable doubt. Rather, it describes the necessary quantity of proof as "substantial evidence," which does not correspond clearly to those usual terms. Consequently, we are left to seek legislative intent to determine the corresponding standard, beginning with the text and context of the statute in question. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) (outlining methodology for interpreting a statute).

The APA does not provide a general definition of the phrase "substantial evidence," *see* ORS 183.310 (defining terms used throughout the APA), nor does it define that phrase in the section governing contested cases. ORS 183.413 to ORS 183.470. The APA section on judicial review, ORS 183.480 to ORS 183.497, also uses that phrase and defines it as a quantity of evidence that, "when the record, viewed as a whole, would permit a reasonable person to make th[e agency's] finding." ORS 183.482(8)(c). However, that definition is not helpful because standards of proof and standards of review are not synonymous: the former guides the factfinder; the latter guides the reviewer of facts already found. Finally, a resort to the common and ordinary understanding of the term "substantial" does not assist us either because it reasonably could be understood to require a significant amount of evidence or merely to require evidence of greater weight than the contrary proof.

The historical context of ORS 183.450(5) is helpful to a proper understanding of that statute's text. *See Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 415, 908 P2d 300 (1995), *on recons* 325 Or 46 (1997) (addressing the historical context of a statute in the first level of analysis). In 1971, the APA was amended to include ORS 183.450(5). Or Laws 1971, ch 734, § 15. Before the 1971 amendment, the Supreme Court had expressed a common principle that, in a case where no criminal sanction was possible, the proceeding was civil in nature. *Burbage v. Dept. of Motor Vehicles*, 252 Or 486, 491, 450 P2d 775 (1969); *see also Thorp v. Dept. of Motor Vehicles*, 4 Or App 552, 556-57, 480 P2d 716 (1971) (applying the same reasoning). At that time, the Supreme Court also had established that in ordinary civil matters, the preponderance of the evidence standard applied,

*see, e.g. Cook*, 214 Or at 526-27, which was consistent with Oregon's current statutory law. *See* ORS 17.250(5) (setting the standards of proof applicable to civil and criminal matters as preponderance of the evidence and beyond a reasonable doubt, respectively).

Given that contested case proceedings do not authorize criminal sanctions, that contextual authority suggests that the legislature similarly viewed contested case proceedings as ordinary civil matters and therefore, intended that the standard of proof prescribed by ORS 183.450(5) correspond to the preponderance standard. However, because that suggestion is not unequivocal evidence of the legislature's intent, we turn to legislative history for additional insight. *PGE*, 317 Or at 611-12.

The legislative history related to the 1971 amendment creating ORS 183.450(5) confirms our textual conclusion that subsection 5 was created to prescribe a "burden of proof." Exhibit in Separate Exhibit File, House Committee on Judiciary, HB 1213, April to June 1971, Section-By-Section Comments on Engrossed HB 1213, p. 7. Though the record fails to describe the applicable burden of proof in the usual terms, several other reports on the 1971 amendments reflect a common concern that contested case hearings provide adequate due process. *See, e.g.,* Exhibit in Separate Exhibit File, House Committee on Judiciary, HB 1213, April to June 1971, Engrossed HB 1213—Supplementary Report of the Committee on Administrative Law to the Senate Committee on Judiciary, p 2 (noting that APA will remove "uncertainty as to whether prescribed procedures meet the constitutional requirements * * * of due process"). As noted, before the 1971 amendment, adequate due process in ordinary civil cases was set by common law and by statute at the preponderance of the evidence standard.

We find particularly persuasive, however, the presence of *Thorp* in the exhibit file. Exhibit in Separate Exhibit File, HB 1213, House Committee on Judiciary, April to June, 1971, *Thorpe v. Dept. of Motor Vehicles*, 4 Or App 552 (1971). *Thorp* stood for the prevailing view that proceedings in which criminal sanctions were not possible generally were to be

viewed as ordinary civil matters, which in turn, meant that the preponderance standard applied. 4 Or App at 556-58. The legislature was aware of *Thorp* and that contested case proceedings did not involve criminal sanctions. Furthermore, the legislative history contains nothing to suggest that the legislature viewed contested case proceedings as something more than ordinary civil cases or that it intended for a standard of proof higher than the preponderance standard to apply. The reasonable inference from that silence, particularly given the prevailing view as to the applicable burdens of proof, is that if the legislature had wanted a burden of proof higher than the preponderance standard to apply, then it would have said so. Because the legislature was silent as to that matter, we hold that, in enacting ORS 183.450(5), the legislature intended to prescribe a standard of proof that corresponded to the preponderance standard.[5]

■     Petitioner also argues that "due process requires a 'clear and convincing' standard of proof in disciplinary proceedings involving health care professionals." Neither the Oregon Supreme Court nor this court has had occasion to consider that question. Because this case presents that occasion, we turn to the Due Process Clause of the Fourteenth Amendment to the United States Constitution to determine whether it requires that the Board prove its allegations of unprofessional conduct by clear and convincing evidence.[6] In doing so, we express no opinion as to whether due process concerns require allegations of fraud in the license revocation

---

[5] Our research has revealed *Rencken v. Young*, 300 Or 352, 711 P2d 954 (1985), in which the Supreme Court suggested in *dicta* that the clear and convincing standard of proof may apply to contested case hearings involving forfeiture of water rights under ORS 540.610(1). *Id.* at n 12. No party has relied on that case. Moreover, because the relevant holding in *Rencken* concerned which party had the burden of proof, *id.* at 364-65, rather than the applicable standard of proof, we do not believe that it has any application here.

[6] The Oregon Constitution does not contain a due process clause. *See State v. Wagner*, 305 Or 115, 145-46, 752 P2d 1136 (1988), *cert granted and vacated on other grounds* 492 US 914 (1989) (refusing to construe Article I, section 10, of the Oregon Constitution, as due process clause).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides:

"[N]or shall any State deprive any person of life, liberty or property, without due process of law[.]"

or suspension context to be proved by that higher standard of proof.[7]

In *Santosky v. Kramer*, 455 US 745, 754, 102 S Ct 1388, 71 L Ed 2d 599 (1982), the United State's Supreme Court considered whether, in a parental-rights termination proceeding, the Due Process Clause required a standard of proof higher than the preponderance standard that was mandated by a state law. The Court relied on the factors identified in *Mathews v. Eldridge*, 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976), noting that those factors applied generally to determinations regarding the constitutional burdens of proof in "particular proceeding[s]." *Santosky*, 455 US at 754. Those factors are: (1) the private interest; (2) the risk of error, including the probable value of additional safeguards; and (3) the countervailing public interest. *Mathews*, 424 US at 335. The Court further explained that, "in any given proceeding, the [constitutional burden of proof] should reflect not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky*, 455 US at 755. Ultimately, the Court concluded that because the possible injury to the individual was greater than the possible harm to society, the clear and convincing standard of proof was required. *Id.* at 768.

Considering the first factor, the interest of petitioner is his right to practice medicine; it is his livelihood, and the potential deprivation of that right is substantial. Such deprivation is tempered, however, by the possibility that a revocation may be reversed by reapplication of the person formerly licensed. ORS 677.220.

The second factor does not mandate a higher standard of proof. Physicians comprise a majority of the Board's membership. ORS 677.235. That fact lowers the risk of error because those Board members are trained in the practices of the medical profession and, thus, are well equipped to analyze the nature of a particular doctor's conduct. Moreover, a

---

[7] Clear and convincing proof is required in civil cases involving allegations of fraud. *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 407, 737 P2d 595 (1987).

clear and convincing standard of proof would only incrementally increase the safeguards against erroneous factfinding in this proceeding. That is so because petitioner's conduct was never an issue. Rather, the dispositive factual determination is related to the professional or unprofessional nature of petitioner's conduct. In that context, the risk of an erroneous conclusion was safeguarded most significantly by the Board members' knowledge and experience as physicians, which they could use to help determine whether petitioner's conduct failed to meet professional standards. A higher standard of proof would not affect that aspect of the Board's decision making process.

The government's interest is also substantial and, here, in contrast to the balance of harms in *Santosky*, weighs in favor of the public. That interest is outlined in ORS 677.015, which provides:

> "Recognizing that to practice medicine * * * is a privilege granted by legislative authority, it is necessary in the interest of the health, safety and welfare of the people of this state to provide for the granting of that privilege and the regulation of its use to the end that the public is protected from the practice of medicine by unauthorized or unqualified persons and from unprofessional conduct by persons licensed to practice under this chapter."

That provision reflects a concern that unprofessional conduct by a physician can endanger life itself. We conclude that the seriousness of that potential harm places the interest of the public above that of a single practitioner and means, in turn, that the licensee should bear the risk of error, rather than the public.

Balancing the three factors, we conclude that the Due Process Clause requires no more than the preponderance of the evidence standard of proof in this case. The Board did not err.

Petitioner also argues that *Bernard v. Board of Dental Examiners*, 2 Or App 22, 465 P2d 917 (1970), and *Van Gordon v. Board of Dental Examiners*, 52 Or App 749, 629 P2d 848 (1981), establish our authority to "interpret[ ] [ORS 183.450(5)] and distinguish[ ] burdens of proof on the basis of

policy." Both of those cases involved license revocation proceedings under the APA for alleged fraudulent conduct and applied the higher standard of proof of clear and convincing evidence.

With respect to the burden of proof issue, the analysis of those cases is questionable because we did not in either case purport to base our decision on either statutory or constitutional grounds. Rather, we derived the clear and convincing standard of proof by analogizing the administrative proceeding to a civil action concerning fraud and to an attorney disciplinary proceeding. *Bernard*, 2 Or App at 36; *see also Van Gordon*, 52 Or App at 765 (merely citing and relying on *Bernard*). Furthermore, the rationale in *Bernard* for a higher standard of proof relied in part on the allegation of fraud, which is not present here. *Bernard*, 2 Or App at 36. For those reasons, *Bernard* and *Van Gordon* are not dispositive in this case.

The second question before us concerns whether the Board improperly permitted a disqualified Board member, Williams, to participate in the deliberations of petitioner's case. The Board argues, first, that the issue was not preserved at the hearing and review level and, thus, is not reviewable by this court. *Woolstrum v. Board of Parole*, 141 Or App 332, 336-37, 918 P2d 112, *rev den* 324 Or 395 (1996).

It appears from the record that the two documents on which petitioner relies were not available to him until after he had exhausted his administrative remedies and had requested the agency record. We assume, because of our disposition of the issue, that, under the circumstances, petitioner timely raised the issue and thus may properly raise it here.

The first document is a transcription of the minutes from a July 17, 1997, meeting at which the Board considered the proposed order in petitioner's case. It notes that Williams "has excused himself." That statement does not of itself implicate petitioner's concerns. However, the second document is more troubling.

The second document records the minutes of a special meeting on September 4, 1997, at which the Board considered petitioner's petition for withdrawal of the final order and for reconsideration. It reflects that Williams was present at an executive session during which petitioner's petition was discussed and that he was present at the subsequent public session during which a Board member moved to deny petitioner's petition. Further, in a section designated as "Vote," the actions of the Board members are listed and described, some voting aye, one nay, and another abstaining. However, following Williams's name, which is listed at the end, there is nothing; his action is not described.

Petitioner argues that, because the document shows that Williams was present during the deliberations of petitioner's petition, the proceeding "was procedurally inadequate and suspect," and, thus, a reversal of the Board's order on reconsideration is mandated. We agree that the document shows that Williams was present, but disagree that reversal is required.

■  In an agency proceeding, an action lacking the appearance of fairness is not enough to warrant its reversal. *1000 Friends of Oregon v. Wasco Co. Court*, 304 Or 76, 84-85, 742 P2d 39 (1987). On review of the agency action, a court will not presume unfairness from appearances alone. *Id.*; *see also* ORS 244.130(2) ("No decision * * * of * * * any board * * * shall be voided *solely* by reason of the failure of the public official to disclose an actual or potential conflict of interest." (Emphasis added.)).

Here, the asserted basis for reversal concerns whether Williams *participated* in the deliberations, which is prohibited by ORS 244.120(2)(b)(A). If that were established, then a reversal of the Board's decision on reconsideration would be warranted. *See Samuel v. Board of Chiropractic Examiners*, 77 Or App 53, 61-63, 712 P2d 132 (1985), *rev den* 302 Or 36 (1986) (reversing the board's choice of sanction because the record established that certain board members actually *discussed* facts not in the record, which "may have influenced" the sanction); *Campbell v. Board of Medical Examiners*, 16 Or App 381, 394-95, 518 P2d 1042 (1974)

(reversing board's order because a disqualified board member "participated in the final decision" as indicated by his signature on the findings of fact, conclusions of law and order of denial). From this record, however, there is no evidence that Williams actually participated in the deliberations. Because more than simply the appearance of unfairness must be established, petitioner has failed to demonstrate that reversal is required.[8] *See Knutson Towboat Co. v. Board of Maritime Pilots*, 131 Or App 364, 377, 885 P2d 746 (1994), *rev den* 321 Or 94 (1995) (holding that "it is petitioner's burden to prove that Board members were biased").

Affirmed.

---

[8] We note that it may be that, to prove his claim, petitioner needed facts that were beyond the agency record. The APA provides a mechanism to go outside the record if there are "disputed allegations of irregularities in procedure before the agency not shown in the record which, if proved, would warrant reversal or remand[.]" ORS 183.482(7). However, we are not aware that petitioner has sought to invoke that procedure.