Argued and submitted June 8, 1983, remanded December 4, 1984, rehearing denied January 29, 1985

In the Matter of the Application by
Teledyne Wah Chang Albany, a
division of Teledyne Industries,
Inc., for a Site Certificate.

## TELEDYNE WAH CHANG ALBANY,
*Petitioner,*

*v.*

## ENERGY FACILITY SITING COUNCIL,
*Respondent.*

(SC 29334)

## MARBET,
*Petitioner,*

*v.*

## ENERGY FACILITY SITING COUNCIL,
*Respondent,*
## TELEDYNE WAH CHANG,
*Intervenor.*

(SC 29343)

## FORELAWS ON BOARD,
*Petitioner,*

*v.*

## ENERGY FACILITY SITING COUNCIL,
*Respondent,*
## TELEDYNE WAH CHANG,
*Intervenor.*

(SC 29344)

692 P2d 86

Richard H. Williams, Portland, argued the cause for petitioner-intervenor Teledyne Wah Chang Albany. With him on the briefs were Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Daniel Meek, Portland, argued the cause for petitioner Forelaws on Board. With him on the brief was Linda K. Williams, Portland.

Lloyd Marbet argued the cause and submitted briefs in propria persona.

James E. Mountain, Deputy Solicitor General, Salem, argued the cause for respondent Energy Facility Siting Council. With him on the briefs were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, and William F. Gary, Solicitor General, Salem.

PETERSON, C. J.

**PETERSON, C. J.**

Lower River Pond consists of 115,000 cubic yards of industrial waste called sludge, located near Albany, Oregon. This case comes to us on direct appeal, ORS 469.400, from a decision of the Energy Facility Siting Council granting a license for the storage of the sludge.

I

The Energy Facility Siting Council (EFSC) is a public body of seven members charged with the responsibility of designating areas that are suitable or unsuitable for use as sites for energy facilities for which the council determines such designations are necessary. ORS 469.450, 469.470.

Teledyne Wah Chang Albany (Teledyne) manufactures zirconium and other rare metals at a plant located in Millersburg, near Albany, Oregon. The principal raw material used in the manufacturing process is zircon sand. Zircon sand, like most earth materials,[1] contains naturally occurring radioisotopes, including radium-226.

During the manufacturing process, elements used to make rare metals are extracted from the sand, and the radioisotopes and other unused components of the sand become waste products. This case concerns such semi-liquid waste products. Until October, 1979, they were pumped to two locations, Lower River Pond and Schmidt Lake, both located near the Willamette River on Teledyne's plant grounds. The sludge contains large volumes of water as it comes from the manufacturing process. As the radium disintegrates, an inert radioactive gas, radon, is formed. The extent of evaporation is an important question in this case because radon release increases as the sludge dries.

Beginning in the 1970's, members of the public and state agencies became concerned about the Teledyne sludge. At that time, state law prohibited the disposal of radioactive materials, but the law did not define "radioactivity." The 1979 legislature considered the Teledyne situation and enacted Oregon Laws 1979, chapter 283. That law modified the total

---

[1] OAR 345-50-010(1), states that "virtually all materials contain some measure of radioactivity."

prohibition against the storage of radioactive waste and directed the Health Division to contract for an independent study of the hazards posed by the storage of low level radioactive wastes in Oregon. The Health Division was then to report to the 1981 legislature on options for dealing with such wastes. After receiving the Health Division's report, the 1981 legislature enacted Oregon Laws 1981, chapter 587. That law permits the storage of specified radioactive wastes "at sites approved by the council." ORS 469.525.

No energy facility may be constructed, expanded, or operated in Oregon unless a site certificate has been issued by EFSC. ORS 469.320(1).[2] Applications for site certificates must be made to EFSC. ORS 469.350.[3] ORS 469.330(1) requires each applicant to file a "notice of intent to file an application for a site certificate," which notice "must describe the proposed site with sufficient detail to enable the council to identify the proposed site." EFSC has the responsibility to conduct public hearings on the proposed siting of an energy facility, ORS 469.470(4). ORS 469.370(1) provides that "[a]t the conclusion of its hearings the council shall either approve or reject the application."

## II

Teledyne filed an application which begins:

> "Pursuant to ORS 469.300 et seq. and Oregon Administrative Rules, Chapter 345, Division 50, Teledyne Wah Chang Albany submits the following application to the Energy Facility Siting Council of the State of Oregon for a site certificate for the construction and maintenance of a radioactive waste disposal facility."

The application sets forth the proposed site with a metes and bounds description. The application also contains a map showing the proposed site.

Teledyne's application states in part:

---

[2] A waste disposal facility for radioactive waste is an "energy facility." ORS 469.300(10)(b), (14).

[3] ORS 469.300(2) defines "application" as "a request for approval of a particular site or sites for the construction and operation of an energy facility * * *." A "site certificate" means "the binding agreement between the State of Oregon and the applicant, authorizing the applicant to construct and operate an energy facility on an approved site * * *." ORS 469.300(20).

"The Council's regulations recognize that virtually all naturally occurring materials contain some radioactivity. OAR 345-50-006. In recognition of that fact, the Council exempts from regulation wastes which contain less than a certain concentration of radioactivity and wastes which release less than certain amounts of radioactivity to the environment (the pathway exemption). *TWCA believes that the wastes covered by this Application meet the pathway exemption and that no site certificate is required.* TWCA is, nevertheless, applying for a site certificate in order to avoid further controversy with the State and to demonstrate its willingness to allay the concerns expressed by some." (Emphasis added.)

Thus, this case involves an application for a license that the applicant claims is not required under the law. This unusual situation poses no particular problem in this case other than in connection with the burden of proof discussed below. The issue whether any site certificate is required loomed large before the agency and does here, as well.

After the application was filed, other parties intervened, including three departments of the State of Oregon (the Health Division, the Department of Environmental Quality, and the Water Resources Department), Friends of the Earth, the Survival Center of the University of Oregon, Forelaws on Board (Forelaws), and Lloyd K. Marbet (Marbet). Forelaws and Marbet are also petitioners on this appeal.

EFSC found that a site certificate was required and ordered that a site certificate issue. The order satisfied neither Teledyne nor Marbet and Forelaws. Their specific claims relative to the order granting the site certificate will be discussed below.

### III

On its appeal Teledyne makes three claims:

1.  Teledyne claims that EFSC erred in finding that the radiation emanating from the sludge was sufficiently high to require a site certificate. In this connection, Teledyne also claims that EFSC erred in placing the burden on Teledyne to prove that the radiation fell within an exempt level of radioactivity.

2. Teledyne claims that if a permit is required, EFSC (a) erred in failing to grant a permit for storage of the sludge on the site location requested, and (b) erred in granting a license to store the sludge instead on nearby land owned by Teledyne, a site location not requested by Teledyne.

3. Teledyne's final claim is that EFSC erred in deciding, on its own motion, that sludge stored at a location called "Arrowhead Lake" was radioactive and by conditioning the site certificate issuance on inclusion of those wastes in the disposal facility.

Forelaws and Marbet raise a number of points on their appeal, including these:

1. They claim the violation by EFSC of a number of Oregon procedural statutes concerning the notice of intent to apply for a site certificate and the notice required to be given to the public and state agencies of the application. They also assert that a temporary rule was adopted in violation of law; that the application was granted too early, without permitting the statutorily-prescribed period to run; that EFSC failed to adopt meaningful standards to implement various statutes; and that the hearings officers were guilty of misconduct.

2. They join Teledyne in the assertion that EFSC erred in granting a site certificate at a different location from that for which the application was made.

## IV

Teledyne's first assignment of error is:

"The Council erred in finding that the sludge does not come within one of the exceptions to the definition of 'radioactive waste' and thus concluding that a site certificate is required:

" 'EFSC finds that sludge will likely create radon levels above three picocuries per liter of air.[4] Therefore, the materials in those ponds are radioactive within the definition in EFSC's rules and a site certificate is required.' "

---

[4]A picocurie is one trillionth of a curie. A curie is a unit of radioactivity equal to $3.7 \times 10^{10}$ disintegrations per second. Webster's Third International Dictionary 556, 1711.

◼  We first examine the relevant statute and rule. As stated above, a license is required for a disposal facility for radioactive waste. The term "radioactive waste" is defined in ORS 469.300(17)(a):

> " 'Radioactive waste' means all material which is discarded, unwanted or has no present lawful economic use, and contains mined or refined naturally occurring isotopes, accelerator produced isotopes and by-product material, source material or special nuclear material as those terms are defined in ORS 453.605. The term does not include those radioactive materials identified in OAR * * * 345-50-035, adopted by the council on December 12, 1978 * * *."

The parties are agreed that the sludge is "radioactive waste" unless it comes within those radioactive materials identified in OAR 345-50-035.

OAR 345-50-035, the rule adopted by reference in ORS 469.300(17)(a), provides:

> "Naturally occurring radioactive materials shall be exempt from the provisions of * * * [the siting statute] if it can be demonstrated that accumulation of material will not result in exposures exceeding 500 millirem of external gamma radiation per year, nor in the release of effluents to air and water in annual average concentrations exceeding the values in Table 3. An evaluation of potential radiation exposures and effluent releases shall be performed using the following premises:

> "(1)  The material shall be considered in the form it exists when it is removed from the users' equipment, systems, or settling ponds prior to any dilution or remedial action designed to reduce radiation levels.

> "(2)  No consideration shall be given to the ameliorating effects of land use restrictions, maintenance operations, or overburden at the disposal site.

> "(3)  Accumulations of material over the reasonably projected period of waste generation shall be evaluated.

> "* * * * *

> "(5)  In computing radon concentrations in the air above a disposal site containing radium-226, the following additional premises shall be used:

> "(a)  Any house built on ground contaminated with radium-226 is assumed to have an 8-foot high ceiling on the first floor, to have one complete air change per hour, and to

have a foundation constructed so as to meet the Structural Specialty Code (State of Oregon Uniform Building Code) effective at the time of adoption of these rules. No consideration will be allowed for any special construction or treatments designed to reduce radon diffusion into the structure.

"* * * * *."

Regarding the levels described in the first paragraph of OAR 345-50-035, EFSC found that the sludge generates gamma levels below the standard of 500 millirems per year and that the water contamination would be less than the levels set forth in Table 3 to OAR 345-50-035. Teledyne does not contest those findings. It does contest EFSC's ultimate finding that "sludge will likely create radon levels above three picocuries per liter of air."[5] Before we discuss that question, however, we must first decide Teledyne's related second assignment of error.

## V

■ The hearings officers assigned Teledyne the burden of proving that the annual average concentration of airborne radon would not exceed three picocuries per liter of air. Teledyne claims that EFSC had the burden of proving that the sludge was "radioactive" (within the definition of ORS 469.300(17)(a)), and that the sludge did not meet the exemption of OAR 345-50-035. We hold that in a proceeding on an application for a site certificate, the burden of proving that the sludge came within the exemption properly was imposed upon Teledyne.

Teledyne, albeit a reluctant applicant, is nonetheless the applicant. In its application, it seeks (1) an adjudication that it need not have a license because the sludge is not sufficiently radioactive and, alternatively, (2) the issuance of a license to store the sludge, should the EFSC find that the sludge is "radioactive" under ORS 469.300(17)(a).

This is not an enforcement proceeding.[6] Teledyne is

---

[5] Table 3, referred to in OAR 345-50-035, sets the three picocuries level. Table 3 establishes the acceptable radon-222 level in air as $3 \times 10^{-9}$ microcuries (uCi) per milliliter. A microcurie is $10^{-6}$ (one millionth) of a curie. This equates to $3 \times 10^{-15}$ curies per milliliter. There are 1,000 milliliters in a liter. $1,000 \times (3 \times 10^{-15}) = 3 \times 10^{-12} = 3$ picocuries per liter.

[6] EFSC has authority to enforce compliance with ORS 469.300 to 469.570. ORS

the party asserting these claims. The burden of proof was properly imposed upon it for these reasons:

ORS 183.450(2) provides in pertinent part:

"* * * The burden of presenting evidence to support a fact or position in a contested case rests on the proponent of the fact or position."

Teledyne's position throughout the EFSC proceedings was that its wastes were within the pathway exemption and, therefore, outside EFSC's jurisdiction. It based this position on factual allegations that its wastes did not emit certain levels of radioactivity. As the proponent of these positions and these facts, Teledyne had the burden of production pursuant to ORS 183.450(2).

OAR 345-50-035 states that "naturally occurring radioactive materials shall be exempt * * * *if it can be demonstrated that* accumulation of material will not result in [specified radiation exposures nor the release of effluents into the air and water in certain annual concentrations]." (Emphasis supplied.) This rule, made a part of ORS 469.300(17)(a), clearly requires demonstration by somebody, but the statute does not expressly allocate that burden. The legislative history shows, beyond doubt, that it was contemplated that Teledyne would have the burden of showing that it met the exemption.

The legislative history reveals that the controlling statute, ORS 469.300(17)(a), was enacted with specific reference to the Teledyne sludge. Bob Godard, then the administrator of the Siting and Regulation Group of the State Department of Energy (who also was one of the hearings officers in this case), testified at a hearing of the House Environment and Energy Committee on February 20, 1979, that "the intent [of the legislature in incorporating OAR 345-50-035 into ORS 469.300(17)(a)] was that the burden of proof be on Wah Chang to show that they were indeed in

---

469.550 authorizes the director to halt the operation of a nuclear installation, to impose safety precautions and to seek revocation of site certificates. Judicial relief is obtainable under ORS 469.550 and 469.570.

compliance and should be further exempted." The burden of proof properly was imposed on Teledyne.[7]

The issue which generated major concern at the EFSC hearing herein was whether the annual average concentration of released radon exceeded three picocuries per liter of air. The key language in OAR 345-50-035, insofar as this case is concerned, is this: In order to meet the exemption, it must be demonstrated that the airborne radioactive release, in annual average concentration, did not exceed three picocuries per liter of air. The statute, incorporating OAR 345-50-035(a), requires that such measurement be made with reference to a hypothetical measuring chamber built above the sludge, described as follows:

> "Any house built on ground contaminated with radium-226 is assumed to have an 8-foot high ceiling on the first floor, to have one complete air change per hour, and to have a foundation constructed so as to meet the Structural Specialty Code (State of Oregon Uniform Building Code) effective at the time of adoption of these rules. No consideration will be allowed for any special construction or treatments designed to reduce radon diffusion into the structure." OAR 345-50-035(5)(a).

There was much discussion at the hearing regarding the "hypothetical house" within which the measurements were to be made. Did the house have a floor? Did it have a vapor barrier? What type of foundation did it have? Were there openings or vents in the foundation?[8] Earlier in this opinion, we referred to the study which the legislature required to be performed. This study, performed by Science Applications, Inc., (herein referred to as the SAI study) concluded that "* * * it is *possible* that the OAR 345-50 (EFSC

---

[7] We express no opinion as to who would have the burden of proving that the sludge did or did not come within the exemption were this an enforcement proceeding by EFSC against Teledyne. See footnote 6.

[8] The parties appear to assume that this "hypothetical house" would have a floor, foundation, walls, and ceiling. The EFSC order makes reference to such variables as:

— "The attenuating effects of vapor barriers"

— "Venting of the crawl space"

— "The floor"

— "The effectiveness of a plastic vapor barrier"

rule) limit of 0.033WL[9] would be exceeded indoors."[10] (Emphasis added.)

EFSC's specific findings of fact included these:

"1.   SAI performed direct radon measurements in the ambient air around Schmidt Lake. On balance, the levels were below the standard. However, specific measurements did exceed the standard. Levels of radon in a house would be higher than measured in the ambient air. Consequently, these direct measurements indicate that at certain times radon levels in a house built directly over sludges would exceed the standard. * * *.

"2.   To more accurately determine whether TWCA sludges are radioactive, the radon buildup in a house built over sludge must be evaluated based on the theoretical house in the standard before a cap is placed over them. In accordance with OAR ch 345, div 50, the house is assumed to have a standard foundation with a crawl space. Sludge under the house will be dry because it is sheltered from rain, and evaporation will occur. The top one foot of the sludge is of greatest interest because this is the location from which the majority of the radon will be released. Calculation of the radon buildup requires: 1) a determination of the sludge moisture level, because radon release increases as the sludge becomes drier; 2) recognition of the attenuating effects of vapor barriers, venting of the crawl space, and the floor; and 3) evaluation of radon levels, assuming one air change per hour in the house. * * *.

"3.   Determination of sludge moisture level can be made from work by Battelle. * * * Figure 3 (Curve C - bare surface evaporation) of TWCA Exhibit 28 illustrates that for sludge under a house, sludge at the surface may be very dry (60% moisture for a water table at 9 feet). Figure 2 of TWCA Exhibit 28 illustrates that as the depth to the water table increases, the moisture levels at the surface drop very rapidly.

---

[9]The term "WL" refers to "working level," which is the level of concentration of radioactivity in the air, not a measure of how much radioactivity a person actually receives. Footnote 3 to Table 3 of OAR 345-50-035 states:

"A working level is defined as any combination of short lived radon $-222$ daughters, polonium $-218$, lead $-214$, bismuth $-214$ and polonium $-214$, in one liter of air, without regard to the degree of equilibrium, that will result in the ultimate emission of $1.3 \times 10^5$ ME V of Alpha particle energy."

[10] OAR 345-50-035 uses the term "nor in the release of effluents to air and water in annual average concentrations exceeding the values in Table 3." Three picocuries of radon per liter of air is the equivalent of .033 working levels.

\* \* \* At depths below 9 feet (3 meters), the water table begins to have little influence on moisture levels at the surface. Without effects of the water table, moisture level of the surface sludge is determined by the humidity of the air. At humidity levels of 57-81%, sludge moisture levels are reported to be 10-20% (Table 2).

"4.   Because groundwater levels at Lower River Solids Pond and Schmidt Lake are expected to be 10-20 feet below the sludge surface \* \* \* it is expected that sludge under a house would have a moisture content of 10-60%.

"5.   Battelle performed tests to determine the effects of a house floor in attenuating radon levels. Battelle estimated that a floor would reduce radon levels by a factor from 2 to 7. Battelle did not consider the effectiveness of a plastic vapor barrier or natural ventilation of the crawl space, both of which would further reduce radon levels. A minimum attentuation factor would be 2. \* \* \*.

"6.   At moisture levels of from 10-60%, radon levels in a house would be 0.036 to 0.37 working levels, which are greater than the standard of 0.033 working levels. \* \* \* These would be reduced by the various attenuating mechanisms of the foundation. With the minimum attenuation, radon in a home would be from 0.018 to 0.18 working levels. Further attentuation will likely occur but has not been quantified."

Based upon these findings, EFSC made this ultimate finding:

"\* \* \* EFSC finds the sludges will likely create radon levels above 3 picocuries per liter of air. Therefore, the materials in those ponds are radioactive within the definition in EFSC's rules and a site certificate is required."

There is evidence that the annual average concentration of radon-222 in the air turns on the moisture content of the sludge. In turn, there is evidence that the amount of radon-222 in the air of the hypothetical house turns, in part, upon the nature of the floor above the sludge, and upon other factors referred to above.

■   ORS 183.470(2) requires that a final order be accompanied by findings of fact and conclusions of law, that the "findings of fact shall consist of a concise statement of the underlying facts supporting the findings as to each contested issue of fact and as to each ultimate fact required to support the agency's order." In order for this court to exercise its

judicial review function it is necessary that there be a rational connection between the underlying findings of fact and the ultimate finding of fact derived from the underlying facts. *City of Roseburg v. Roseburg City Firefighters,* 292 Or 266, 271-72, 639 P2d 90, 94 (1981).

The hearings officers (and ultimately, EFSC) determined that the annual average radon concentrations would exceed three picocuries per liter of air. In its brief, EFSC mainly relies upon two studies to support that conclusion. We quote from the EFSC brief:

"SAI performed direct radon measurements in the ambient air around Schmidt Lake. On balance, the levels were below the standard. However, specific measurements did exceed the standard. Levels of radon in a house would be higher than measured in the ambient air. Consequently, these direct measurements indicate that at certain times radon levels in a house built directly over sludge would exceed the standard * * *.

"THE SAI Report, in the record as EFSC Ex. 11, supports EFSC's determination that radon levels in a theoretical house built on TWCA sludge would exceed 3 picocuries of radon per liter of air or 0.033 working levels. SAI reported that radon levels in the ambient air surrounding the sludge ponds exceeded 3 picocuries of radon per liter of air. EFSC Ex. 11, p. 233. SAI determined that because radon levels in a house on the sludge would be higher than radon levels in the ambient air, it was 'not necessary to speculate' that the indoor air concentration of radon would exceed 0.033 working levels. EFSC Ex. 11, p. 233. The SAI Report is substantial evidence supporting EFSC's jurisdictional findings and conclusion; it contradicts TWCA's evidence."

The SAI study involved the taking of ambient air samples. Some of the measurements exceeded the standard; most did not. EFSC stated in its order, "[o]n balance, the levels were below the standard."

To determine the effect of evaporation, EFSC drew upon a table in a Battelle report offered by Teledyne. We quote EFSC's brief:

"* * * The next finding shows that EFSC examined TWCA Ex. 28, Figure 3, Curve C which profiled 'bare surface' evaporation. Order, Sec. IV F., Finding 3, p. 24; *see also,*

Order, Sec. VI B. 1. B. (finding relating to TWCA's exceptions to the order). Correlating the data in TWCA Ex. 28, Figure 3, Curve C with other data, EFSC found that sludge under a hypothetical house would have a moisture content of 10-60% with resulting radon levels in excess of the 0.033 working levels standard. (Order, Sec. IV F., Findings 4-6, p. 25). Applying a pertinent attenuation factor (Order, Sec. IV F., Finding 5, p. 25), EFSC found that the range of radon levels would vary from the permissible (0.018) to the impermissible (0.18). (Order, Sec. IV F., Finding 6, p.25)."

■        Figure 3, Curve C is a crude graph, offered for illustrative purposes only, and is not sufficient to support the conclusion that the moisture content under a house would fall between 10% and 60%. The most that can be concluded from the specific facts found by EFSC is that the radon concentrations in the ambient air would range from .018 working levels to .18 working levels. Because of the fluctuation of radon emissions, the specific findings relative to the range of emissions do not support the conclusion that the annual average concentration would be exceeded. That the radon-222 concentration at certain times exceeds the allowable annual average concentration does not prove an *annual* average concentration in excess of that allowed by law.

Our conclusion on this point is fortified by a colloquy which occurred at an EFSC hearing on December 9, 1982. In November, 1982, the hearings officers submitted the hearings record and a proposed order to the members of the EFSC. On December 9, 1982, EFSC met to consider the matter. The first question put to one of the hearings officers by Ms. Mater, a member of EFSC, was as follows:

"Mr. Ostrander, as I understand it, the Wah Chang sludge is within the jurisdiction of this Council if it exceeds the pathway exemption, and the pathway exemption has criteria that determine its appliance *[sic]*. The record seems to be conclusive on two criteria. There doesn't seem to be any question that it meets that pathway exemption within two criteria, but on the third criteria, the radon level, the evidence in the record does not seem to be, to me at any rate, conclusive. It depends on which theory you subscribe to as whether those radon levels exceed or do not exceed the acceptable level and depends upon which theory you subscribe to.

"My question is, that the law needs to be clarified for me as to whether it's encumbent *[sic]*, whether the law states that it is encumbent upon Teledyne Wah Chang to prove conclusively that the sludges are exempt from the pathway exemption or does the Siting Council have to prove conclusively that they are not. And I think this is a significant point because so many people seem to be terrified of the radioactivity that is alleged to be emanating that it's important to put it into perspective that whatever our conclusion today the radioactivity of the sludge is very low and possibly so low that it's not even within the jurisdiction of the Siting Council."

Mr. Ostrander deferred to Mr. Godard who, in answering the question, gave this explanation:

"Now in doing so, we came to the conclusion that we thought radon levels would exceed the limits set by the legislature and would establish your jurisdiction. There are two fundamental reasons for that. One is on a technical basis, work done by Battelle shows that if moisture levels in that sludge are less than 60 percent then the radon levels would exceed the standard. We found that the moisture level in the sludge would be below that 60 percent. This may be an issue that will be discussed later today.

"The second reason is that this sludge has been spread on agricultural fields and it's the Health Division's recommendation that houses be precluded from existing on those agricultural fields because of the radon build-up problems. And to find that the Council did not have jurisdiction while the Health Division is saying at the same time that precautions need to be taken with the sludge, would be inconsistent."

EFSC's responsibility was to make its determinations on the facts in the record, not upon the recommendations of another department.

An agency deciding a contested case must demonstrate for the contestants and this court that its findings lead to a reasoned conclusion. Specific findings of fact must lead to and support the ultimate findings. ORS 183.470(2). There must be a rational connection between the specific findings and the ultimate finding and the ultimate conclusion. *Ross v. Springfield School Dist. No. 19,* 294 Or 357, 370, 657 P2d 188, 195 (1982).

A remand is in order because the specific findings

quoted above do not support EFSC's finding that the annual average radon concentration exceeds three picocuries per liter of air. On remand, all parties should be permitted to offer further relevant evidence addressing this question.

## VII

Teledyne and Forelaws assert that EFSC erred in approving a waste disposal facility site at a location other than that for which a license had been sought by Teledyne.

Although EFSC found that the Lower River Solids Pond was a "suitable" site, it found on its own initiative that property owned by Teledyne approximately one mile north of its plant was a "preferred option," a "more suitable" location for the facility. The final order required that groundwater studies be performed. The order stated that if groundwater studies confirmed that the northerly location groundwater impacts were less than or equal to the groundwater impacts at Lower River Pond, Teledyne must move the sludge and construct the facility there. The order further provides that if the groundwater studies show that the northerly location is not an acceptable site, Teledyne may construct the facility at the Lower River Pond.

The northern site eventually selected was first mentioned as an alternative in the hearing officers' draft of a proposed order issued on November 22, 1982. The EFSC approval of the northern site apparently contemplates no further public participation after the groundwater studies and no provision for participation of other state agencies. EFSC, in overruling exceptions to the proposed order, stated:

> "* * * EFSC finds (as it has in Finding of Fact II A-1 above) that the site under consideration in this proceeding includes all of TWCA's plant site. ORS 469.300(19) provides that an energy facility includes '... *any* proposed location of an energy facility and related or supporting facilities.' (Emphasis added.) ORS 469.300(18), in turn, defines related and supporting facilities to include any structure adjacent to and associated with an energy facility. The TWCA industrial plant site, as a whole, is the source of the sludges and as a whole is a related and supporting facility. * * *"

ORS 469.330(1) requires that an applicant file a notice of intent to file an application for a site certificate. The

statute requires that "[t]he notice of intent must describe the proposed site with sufficient detail to enable the council to identify the proposed site."

ORS 469.300(2) defines "application" as "a request for approval of a particular site or sites for the construction and operation of an energy facility * * *." ORS 469.300(19) defines "site" as "any proposed location of an energy facility and related or supporting facilities." Teledyne's application contained a metes and bounds description of the proposed site and a map and a scale drawing of the specific location. ORS 469.370(1) provides that "[a]t the conclusion of its hearings the council shall either approve or reject the application."

■     Applicants for licenses are entitled to a decision on their request based upon the application of the appropriate standards to the facts. As stated in *Marbet v. Portland Gen. Elect.,* 277 Or 447, 460, 561 P2d 154, 162 (1977):

> "* * * The demand of ORS 469.470 for standards 'that applicants for site certificates must meet,' indicates that these standards will be available to applicants and to persons opposing applications in sufficiently meaningful terms to guide them in deciding whether and how to submit or oppose an application. The planning of energy facilities takes too much effort, time, and expense to be exposed to rejection under a standard which the applicant could not have known even in broad terms and which it might not have undertaken to meet. * * *"

OAR 345-50-040 is consistent with the quoted statement. It provides:

> "OAR 345-50-040 through 345-50-130 establish standards that applicants for site certificates for waste disposal facilities must meet. The Council will apply these standards in reaching a decision for or against issuance of a site certificate for the construction and operation of a waste disposal facility and 'its related or supporting facilities' as defined in ORS 469.300. * * *"

■■     The parties operated on the assumption that they were addressing a proposal for *in situ* disposal; that was the only site considered. The parties did not present evidence addressed to, and the public did not have an opportunity to comment on, disposal of the wastes at the northern parcel.

ORS 469.375 states:

"The council shall not issue a site certificate for a waste disposal facility for * * * radioactive waste * * * unless accompanying its decision, it finds:

"(1)   The site is suitable for disposal of such wastes, and the amount thereof * * *."

This standard does not permit the Council to reject a proposed site because it believes another location is better. EFSC was obligated to accept or reject the Lower River Pond on its own merits, rather than engaging in a comparison.

■      EFSC's decisionmaking was improper because the site suitability standard does not call for comparisons; a location either satisfies the standard or it does not, and if it does — and the other standards are met — the applicant is entitled to a certificate for that location. By employing a comparison, EFSC exceeded its statutory authority, violated its own rules and employed a previously unarticulated standard — namely, whether there was a site which it thought "more suitable."[11]

EFSC found that Teledyne's industrial plant site, "as a whole, is a related and supporting facility." The term "related or supporting facilities" is defined in ORS 469.300(18) as follows:

" 'Related or supporting facilities' means any structure adjacent to and associated with an energy facility, including associated transmission lines, reservoirs, intake structures, road and rail access, pipelines, barge basins, office or public buildings, and commercial and industrial structures proposed to be built in connection with the energy facility."

■      EFSC misapplies ORS 469.300(18). Even if the term "related or supporting facilities" includes the Teledyne plant and related structures which create the waste, the term would not include all land owned by Teledyne at the plant site.

## VIII

■      Teledyne's final point is that EFSC erred in deciding, on its own motion, that wastes stored at a location called

---

[11] EFSC found that "disposal at Lower River Solids Pond is suitable if the dikes are modified as described above, including the deep toe or rip rap placed along the river bank."

"Arrowhead Lake" were radioactive, and by conditioning the issuance of the site certificate on inclusion of the Arrowhead Lake wastes in the wastes to be consolidated at the northern site.

On its own initiative and over the objections of Teledyne and other parties, EFSC introduced evidence concerning Arrowhead Lake. Arrowhead Lake was not mentioned in the Teledyne application and Teledyne did not ask for a license to store those wastes.

The effect of EFSC's action is to convert a license application proceeding into an enforcement proceeding. EFSC erred in conditioning its approval on the inclusion of the Arrowhead Lake wastes.

## IX

Forelaws asserts (1) that EFSC lacked jurisdiction because Teledyne failed to file a notice of intent as required by ORS 469.330(1) (quoted above at pages 244 and 256); (2) that if Teledyne's letter of January 18, 1982, is deemed a notice of intent it is legally insufficient because it does not identify the proposed location in sufficient detail; (3) that a temporary rule adopted in June of 1982 is invalid because required notice of the adoption of the temporary rule was not given; (4) that EFSC failed to "cause public notice to be given" as required by ORS 469.330(2);[12] (5) that copies of the notice of intent were not sent to other state agencies as required by ORS 469.350(3)[13] and (6) that the required review period was not

---

[12] ORS 469.330(2) provides:

"The council shall cause public notice to be given whenever a notice of intent is filed and provide a description of the proposed site in sufficient detail to inform the public of its location."

[13] ORS 469.350(3) provides:

"Copies of the notice of intent and of the application shall be sent for comment and recommendation within specified deadlines established by the council to the Department of Environmental Quality, the Water Policy Review Board, the State Fish and Wildlife Commission, the Health Division, the Water Resources Director, the State Geologist, the State Forestry Department, the Public Utility Commissioner of Oregon, the State Department of Agriculture, the Department of Transportation, the Department of Land Conservation and Development, the Economic Development Department and any city or county affected by the application."

observed.[14]

■     Although EFSC is guilty of some procedural violations, none of the alleged defects divest EFSC of jurisdiction to hear the matter. Because the case is being remanded to EFSC for further proceedings, questions relating to additional notice to be given upon the remand can be addressed to and considered by EFSC.

■     Forelaws also asserts that EFSC failed to adopt meaningful standards to implement ORS 469.375. It attacks OAR 345-50-060, 345-50-070 and 345-50-080, rules promulgated to implement ORS 469.375(1)-(7). These rules appear to be specific enough to satisfy the demands of *Marbet v. Portland General Electric Co.*, 277 Or 447, 561 P2d 154 (1977).

*Marbet* requires that standards under the Energy Facilities Siting Act be "available to applicants and to persons opposing applications in sufficiently meaningful terms to guide them in deciding whether and how to submit or oppose an application." *Marbet v. Portland Gen. Elect., supra,* 277 Or at 460, 561 P2d at 162 (1977). The above-cited rules satisfy the requirements of *Marbet.*

**14.**     Forelaws also claims that EFSC failed to establish standards under ORS 469.470(3) concerning the financial ability of site certificate applicants to construct and operate the disposal site.

ORS 469.470 provides in part:

"The council shall:

"* * * * *

"(3) Establish standards and promulgate rules that applicants for site certificates must meet including, but not limited to, standards of financial ability and qualifications as to ability to construct and operate the energy facility to which the site certificate applies and prescribe the form."

EFSC points to OAR 345-50-120 as its rule implementing the financial standard of ORS 469.470(3). OAR 345-50-120 provides:

---

[14] On this point, Forelaws claims that OAR 345-50-006 required a 12-month waiting period before an application could be filed. *Compare* ORS 469.350(1). EFSC adopted an emergency, temporary rule to eliminate the 12-month period.

"(1)   In order to issue a site certificate for a waste disposal facility, the Council must find that, where federal funding for remedial actions is not available, a surety bond in the name of the state has been provided in an amount determined by the Oregon Department of Energy to be sufficient to cover any costs of closing the site and monitoring it or providing for its security after closure and to secure performance of any site certificate condition.

"(2)   Estimates of the cost of closing the site shall include the cost of the effort to comply with the site suitability requirements of OAR 345-50-060 and the radioactive release limits of OAR 345-50-100. The cost of monitoring the site, providing for its security after closure and ensuring performance of site certificate conditions shall be based on the amount of investment principal and proceeds of which would be sufficient to provide for the cost of quarterly visits to the plant site by state regulatory agencies for inspections and environmental sampling."

The above-quoted standard is sufficient under *Marbet*. If anything, the standard at issue here is more informative than the standard at issue in *Marbet. See Marbet,* 277 Or at 464-66, 561 P2d at 165. OAR 345-50-120 adequately implements ORS 469.375(7) and ORS 469.470(3).

Forelaws also asserts:

"* * * In this case, the Council appointed two co-presiding officers, Mr. Ostrander and Mr. Godard, which is one more hearing officer than the Council's rule authorizes. Record 132/765 (Fe. 26, 1982). Mr. Ostrander is an employee of the Oregon Department of Justice, while Mr. Godard is an employee of the Oregon Department of Energy. The appointment of these hearing officers and their conduct during the proceeding renders its result invalid."

OAR 345-15-027(1) provides that EFSC "may appoint a presiding officer to conduct hearings on a site certificate." The Council appointed Frank Ostrander, Assistant Attorney General, and Don Godard, of the Oregon Department of Energy, co-presiding officers. At a public hearing held April 6, 1982, Mr. Ostrander said:

"The reason that there are two presiding officers in this case is that it is complicated. I am a lawyer. I have a Master's Degree in Urban Planning, but I don't understand radioactivity very well. Don [Godard] has got an Engineer Degree in that

sort of thing and worked for the Navy Radioactive Program under Admiral Rickover for several years and purports to know what a picocurie is. That's the reason for this [dual appointment]."

Although OAR .345-15-027(1) literally calls only for the appointment of "a presiding officer," there is no prohibition against the appointment of more than one.

Forelaws also claims that Godard was biased because he had been employed by Teledyne six years earlier. Forelaws points to no other evidence of bias.

One claiming that a hearings officer is biased has the burden of showing actual bias. *See Boughan v. Board of Engineering Examiners,* 46 Or App 287, 611 P2d 670, *rev den* 289 Or 588 (1980). Prior employment six years earlier, without more, is insufficient to establish actual bias.

## X

Some of Marbet's claims have already been discussed. He also asserts that the evidence is insufficient to support EFSC's findings relating to six of the seven statutory standards of ORS 469.375. There is evidence to support the EFSC findings relative to availability of alternate sites, ORS 469.375(2), federal compatibility, ORS 469.375(3), adjacent state compatibility, ORS 469.375(4), deed restrictions, ORS 469.375(6) and surety bond, ORS 469.375(7).

Marbet also asserts that EFSC's "determination that [the OAR 345-50-060] standard has been satisfied is not supported by substantial evidence in the record." We have examined the record and conclude that EFSC's findings under OAR 345-50-060[15] are supported by substantial evidence.

Several other claims are asserted by Marbet and Forelaws. They either lack merit or are moot because the case is being remanded to EFSC.

---

[15] OAR 345-50-060 provides:

"In order to issue a site certificate for a waste disposal facility, the Council must find that the site is suitable for disposal of such wastes, and the amount thereof, intended for disposal at the site. A site will be considered suitable if it can be designed to prevent dispersal of the waste due to a 100-year flood, as estimated and mapped by the U.S. Army Corps of Engineers, and the wind and water erosion to be reasonably expected at the site."

On remand, EFSC should either grant or deny the application sought by Teledyne. EFSC should consider all evidence heretofore offered and such further admissible evidence the parties may wish to offer concerning the suitability of the Lower River Pond site, and specifically, evidence concerning whether the release of effluents to air, in annual average concentrations, exceeds the values in Table 3 of OAR 345-50-035 in the chamber described in OAR 345-50-035(5)(a).

Remanded to EFSC for further proceedings.