Argued and submitted July 1, affirmed November 23, 1994

# KNUTSON TOWBOAT COMPANY,
## *Petitioner,*

### *v.*

# OREGON BOARD OF MARITIME PILOTS;
## Portland Steamship Operators Association;
## Yaquina Bay Pilots Association;
## and Coos Bay Pilots Association,
### *Respondents.*

**(93-3; CA A79691)**

885 P2d 746

John F. McGrory, Jr., argued the cause for petitioner. With him on the briefs was Davis Wright Tremaine.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent Oregon Board of Maritime Pilots. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Kevin Q. Davis filed the brief and waived oral argument for respondents Yaquina Bay Pilots Association and Coos Bay Pilots Association.

David Bartz argued the cause for respondent Portland Steamship Operators Association. With him on the brief were Darien S. Loiselle and Schwabe, Williamson & Wyatt.

Thomas W. Sondag, Mark M. Loomis and Lane Powell Spears Lubersky filed the brief *amicus curiae* for The Port of Kalama.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

ROSSMAN, P. J.

## ROSSMAN, P. J.

Petitioner Knutson Towboat Company seeks review of an order of the Board of Maritime Pilots (Board) setting pilotage rates and adopting a settlement agreement between Oregon pilot groups and the Portland Steamship Operators Association (PSOA) implementing an increase in rates and charges assessed by pilots for pilotage services. We review the Board's order under ORS 183.482 for substantial evidence and errors of law and affirm.

When a ship enters or leaves one of the state's "pilotage" grounds, on its way to or from sea, a licensed maritime pilot boards the ship and helps to maneuver it through the pilotage grounds. ORS 776.015. The legislature has determined that only individuals who have experience in maritime piloting and who can demonstrate knowledge of currents, tides, soundings, bearings and distances of the shoals, rocks, bars, points of landing, and lights and fog signals, can pilot a vessel on a specific pilotage ground. ORS 776.035(2).

Oregon has four pilotage grounds: The Columbia River bar, which extends from the uppermost dock or wharf at the Port of Astoria or Knappton to the open sea in at least 30 fathoms of water; the Columbia and Willamette River pilotage ground, which extends from the lowermost dock or wharf at the Port of Astoria to the head of navigation on the Columbia and Willamette Rivers and their tributaries; the Coos Bay bar, which extends from the head of navigation on Coos Bay and its tributaries to the open sea in at least 30 fathoms of water; and the Yaquina Bay bar, which extends from the head of navigation on Yaquina Bay and its tributaries to the open sea in at least 30 fathoms of water. ORS 776.025.

Pilots serving Coos and Yaquina Bays must have the skills of both a bar pilot and a river pilot. All must hold a valid shipmaster's license from the Coast Guard and must have served at least two years as master aboard vessels. The Board has licensed five pilots for Coos Bay. Four of them also hold licenses for Yaquina Bay. All of them operate from Coos Bay and travel 75 miles to Yaquina Bay (ten hours by boat) when a ship needs service. They work a schedule of three weeks on

duty, 24 hours per day, and two weeks off duty. The five pilots provide service 24 hours per day, 365 days per year.

When a ship calls on Coos or Yaquina Bay, a pilot boards the ship at open sea and advises the master on navigation across the bar and through the bay and harbor. The pilot docks the ship, usually with the assistance of tugs. When a ship leaves Coos or Yaquina Bay, the pilot boards the ship at dock, unberths the ship with tug assistance and helps to navigate the ship to sea. Pilots boarding inbound ships at sea do so from pilot boats. The pilot boats are also used by pilots disembarking at sea from outbound ships. To ensure that pilotage service is available on demand, pilots are required by law to have pilot boats readily available. Because of the conditions under which pilots must work, operation of pilot boats can be extremely hazardous.

The five Coos Bay/Yaquina Bay pilots are members of the Coos Bay Pilots Association (CBPA), an unincorporated organization of pilots who are associated

> "for cooperative performance of functions, including but not limited to, the dispatching of pilots, collection of pilotage fees, ownership and operation of pilot boats, distribution of pilots' earnings and education and training so as to facilitate the rendition of pilotage services by individual pilots." ORS 776.015(3).

The five members of CBPA are shareholders in the Coos Bay Towboat Company (CBTC), an entity legally incorporated and operated separately from CBPA. CBTC owns three tugboats. The tugs are chartered to CBPA for use on demand as pilot boats. CBTC charges CBPA a flat rate each month for pilot boat service. The annual cost to CBPA for pilot boat service is $497,200. The Board approved that amount as a reasonable, reimbursable pilotage expense in 1989. The same amount was approved by the Board in 1993 as a reimbursable expense, in the decision now on review.

In addition to providing pilot boat service to CBPA, CBTC uses its tug boats for towing barges. It also provides ship assist services to inbound or outbound ships, assisting them into and out of berths in the port. CBTC sells its ship assist services directly to the owners, operators or agents of shipping companies. Petitioner also provides ship assist work

with two tugs, CAPTAIN LOUIE and COOS KING. Thus, petitioner and CBTC are competitors in the ship assist market. From 1989 to mid-1992, CBTC performed approximately 81 percent of the total ship assists and petitioner performed approximately 19 percent. Ship assist work is not regulated by statute.

A number of owners, operators and agents of ocean-going vessels are members of the Portland Steamship Operators Association (PSOA). PSOA members purchase pilotage services from CBPA and pay the rates set by the Board. PSOA members also purchase ship assist services from CBTC and petitioner, who, itself, is a member of PSOA.

The tugboats owned by CBTC are not pure pilot boats. They are suitable and used for ship assist services as well as piloting. CBTC's tugboats are more expensive to own and operate than would be a single-use pilot boat.

The Board is charged with the responsibility of fixing pilotage fees at "reasonable and just" rates. ORS 776.115(5). In fixing fees, the Board is required to give due regard to the factors listed in ORS 776.115(5)(b). The Board is required to retain a hearings officer of the Public Utility Commission to conduct rate proceedings, which are to be conducted in accordance with the Administrative Procedures Act, ORS Chapter 183. ORS 776.129; ORS 776.375(2). The Board's method of setting pilotage rates first requires the establishment of a target net income for the pilots. To that figure is added the cost of providing the service, including expenses of the pilots. The Board has its own ratesetting rules that address reimbursement of expenses. OAR 856-30-000 provides that

> "[t]he Board shall, for each pilotage grounds establish a rate structure which provides for efficient, economical and competent pilotage service and fair compensation for pilotage services and expenses * * *."

In determining compensation for expenses, the Board is required to consider evidence of

> "appropriate expenses relating to the provision of pilotage services as shown by records of the pilots' group, and verified by an independent audit." OAR 856-30-000(2).

Because pilots are required by law to provide themselves with a means of boarding and leaving vessels at sea, ORS 776.325(3), the Board allows pilot boat hire as an appropriate expense and has set pilotage rates based in part on approved levels of payments by pilot groups for pilot boat use. Although rates are permitted to include the cost of pilot boat use, the Board does not regulate pilot boats or their operation.

In July, 1992, pilot groups filed petitions with the Board for an increase in pilotage rates for each of Oregon's pilotage grounds. The petitions were consolidated for hearing. The Board issued separate orders as to each petition, and this review concerns only the petition of CBPA, with regard to the Coos Bay Bar and Yaquina Bay Bar pilotage grounds. Petitioner on review sought to intervene in the proceeding, contending that it has an interest in the outcome of the proceeding in the light of its ship assist work in Coos Bay. A hearings officer appointed by the Board determined that, because CBTC recovers part of the cost of its boats from pilotage, excessive cost recovery from pilotage could be used to subsidize ship assist services and thereby put petitioner at a competitive disadvantage; accordingly, the hearings officer allowed petitioner to intervene.

The hearings officer's written "inter-office correspondence" to the Board lists four possible methods for determining the pilot boat expense:

"1. Audit Method: Audit the pilot's records to determine the actual amount the pilots pay to the towboat company, accept that amount as reasonable, and incorporate it into rates.

"2. Actual Cost Method: Determine the towboat company's actual cost of operation, determine a reasonable percentage to allocate to pilotage, and incorporate that amount into rates.

"3. Competitive Bid Method: Determine what competing vendors would bid to provide the service, assume that the pilots would accept the lowest responsible bid, and incorporate that amount into rates.

"4. Budget Method: Design the optimal service to meet the need, identify the capital and operating costs, and incorporate into rates."

Following a prehearing conference to discuss the various methods, the parties were asked to submit briefs as to which of the four methods might be most appropriate. Petitioner advocated the use of the actual cost method, which would require a determination of the actual costs to CBTC of providing pilot boat service to CBPA. CBPA argued that the actual cost method would require disclosure of confidential information. It offered to make CBTC's financial records available to the Board for *in camera* review by the Board, but declined to disclose them to petitioner. CBPA advocated against the adoption of any single approach, but if the Board were to choose an approach, CBPA recommended a combination of the audit method and the budget method, and a rejection of the actual cost method.

On October 16, 1992, the hearings officer recommended to the Board that the budget method was the only feasible method. The hearings officer rejected the audit method, concluding that, although the pilots' actual expenses are a necessary starting point for an analysis, they are not adequate in this circumstance, where the pilots own the vendor of pilot boat service. The hearings officer said:

> "Ownership creates an opportunity for the pilots to indirectly increase income from pilotage by paying themselves an excessive amount for pilot boat services. The risk of excessive compensation creates a need for verification that the actual expenses are reasonable. The need for verification prevents the board from relying exclusively on actual expenses in determining the reasonableness of the pilot boat expense."

The hearings officer rejected the "competitive bid method" as unfeasible, because of the lack of a competing vendor "in a position to seriously bid for the work." The hearings officer also rejected the actual cost method, concluding that it would be unduly complicated by virtue of the fact that the vendor, CBTC, owns boats that are larger and more costly than pilot boats need to be, and its provision of ship assist services may require more boats than would a pilot boat service alone. The hearings officer concluded that the budget method was the only appropriate method.

Board member Davis, who is a member of CBPA, requested that CBPA's attorney—who happens also to be Davis' personal lawyer—draft a motion advocating use of the

audit method or the budget method. The attorney for CBPA drafted the motion and was also present at a meeting between two Board members on the morning of October 20, concerning the motion. Later that day, the full Board met to consider the hearings officer's recommendations. The Board advised the parties that the only method it would not consider was the actual cost method.

Petitioner made discovery requests for documents related to communications between CBPA's attorney and Davis, and between Davis, the attorney for CBPA and other Board members. CBPA responded that communications between Davis and his attorney were subject to the attorney-client privilege and that there were no documents with respect to communications between CBPA counsel and any Board member other than Davis. The hearings officer asked that petitioner consult with counsel for the Board:

> "The Hearings Officer has contacted [Board counsel] who agreed to poll board members on exparte contacts and, if necessary, assist them in preparing disclosure statements. Any statements will come in the form of a letter to the Hearings Officer with copies to the parties. Any party desiring to rebut any factual representations in an exparte contact should contact the Hearings Officer. He will establish an appropriate procedure for the rebuttal."

By letter dated November 2, 1992, counsel for the Board asked each Board member to disclose any *ex parte* contacts with any attorneys other than his or her own. In a letter dated November 30, 1992, Davis disclosed to all parties the October 20 communication involving himself, counsel for CBPA and the Columbia River Bar Board member, Salfen. Board member Salfen made a similar disclosure. Petitioner did not request an opportunity to rebut the disclosed communication.

The Board met again on December 15, 1992, to address the issue of *ex parte* contacts. Counsel for the Board expressed the view that Board members need not disclose communications with their own attorneys, but invited the parties to comment in writing.

Counsel for CBPA requested that petitioner produce information on an *ex parte* contact between petitioner's general manager Knutson, petitioner's counsel, and Board member Wainwright. Petitioner argued by letter that Board

members should be required to disclose *ex parte* communications with their own personal attorneys, or be recused.

Following receipt of petitioner's comments, counsel for the Board again requested that all Board members disclose *ex parte* communications. Counsel explained that a communication regarding a fact in issue "from any source" is an *ex parte* communication:

> "In order to assure full compliance with these requirements regarding disclosure of ex parte communications I request that you determine whether, from the time the rate petitions were filed to the present, you have received *any* oral or written ex parte communications from any source. If you have, I request that you so advise me at the earliest opportunity and either describe the substance of any oral communications or provide me with copies of any written communications. I will then assist you in placing these statements in the record so the parties will have an opportunity to provide rebuttal."

In a three-page letter dated February 26, 1993, Davis made disclosure of communications with counsel for CBPA. Board member Salfen provided a letter indicating that he had had no *ex parte* contacts other than those already disclosed. On March 2, 1993, Board member Wainwright disclosed that she had had a meeting with petitioner's general manager, Knutson, with counsel for petitioner and with counsel for PSOA.

In the meantime, the hearings officer had held further proceedings and had made final recommendations on the substance of the pilotage rates. On March 15, 1993, petitioner filed a Motion for Recusal of six Board members, including Davis and Wainwright, and a motion to conduct additional discovery on the *ex parte* contacts and to present rebuttal testimony. The Board met on March 16, 1993. Petitioner was granted the opportunity to present rebuttal testimony, but was denied further discovery. Petitioner presented rebuttal evidence by testimony of Knutson, petitioner's manager.

The Board then considered the hearings officer's final rate recommendations. Board members Davis and Wainwright recused themselves from the final deliberations. The Board adopted the hearings officer's recommendations by unanimous vote, with only minor changes. The Board determined that the record supported the reasonableness of

CBPA's payments to CBTC for pilot boats as a basis for setting pilot boat expense. It did not consider the actual cost to CBTC of providing pilot boat service to CBPA.

■    We first consider petitioner's contention that the proceeding was deficient because the Board refused to permit petitioner to discover documents relating to the substance of the *ex parte* communications between Board member Davis, his attorney and other Board members. Petitioner's assertion appears to be grounded on the assumption that the documents would have revealed further, undisclosed *ex parte* contacts. ORS 183.462 provides:

> "The agency shall place on the record a statement of the substance of any written or oral ex parte communications on a fact in issue made to the agency during its review of a contested case. The agency shall notify all parties of such communications and or their right to rebut the substance of the ex parte communications on the record."

Petitioner contends that it was entitled to discovery of any documents relating to the nature or substance of disclosed *ex parte* contacts. Under the statute, petitioner was not entitled to documents, if there were any, that may have related to the *ex parte* contacts. It is sufficient that the substance of the *ex parte* communication was placed on the record. We have reviewed the record and conclude that the hearings officer followed the statutory procedures for disclosure of *ex parte* communications. We hold that the hearings officer acted within his discretion in declining to permit additional discovery.

   Petitioner next contends that the proceeding is tainted and the decision must be overturned, because Board members failed to disclose actual and potential conflicts of interest and failed to recuse themselves from participation in the light of those conflicts.

■    We note at the outset that this case is not a proceeding to enforce the government ethics laws. The only question is whether the Board's decision is defective because of Board members' conflicts of interest and, if so, whether that defect requires reversal. The parties agree, however, that in making that determination we look to the government ethics laws.

An "actual" conflict of interest exists as to

"any action or any decision or recommendation by a person acting in a capacity as a public official, the effect of *which would be* to the private pecuniary benefit or detriment of the person or the person's relative or any business which the person or the person's relative or any business with which the person or a relative of the person is associated * * *." ORS 244.020(1). (Emphasis supplied.)

A "potential" conflict of interest

"means any action or any decision or recommendation by a person acting in a capacity as a public official the effect of *which could be* to the private pecuniary benefit or detriment of the person or * * * a business with which the person is associated, unless the pecuniary benefit * * * arises out of * * *

"(a) An interest or membership in a particular business, industry, occupation or other class required by law as a prerequisite to the holding by the person of the office or position." ORS 244.020(7). (Emphasis supplied.)

Thus, a conflict is "actual" when the decision is certain to be to the private pecuniary advantage or disadvantage of the Board member; it is "potential" when the advantage or disadvantage is only a possibility. ORS 244.120(1) provides:

"(a) When met with a potential conflict of interest, [the public official must] announce publicly the nature of the potential conflict prior to taking any action thereon in the capacity of a public official; or

"(b) When met with an actual conflict of interest, [the public official must] announce publicly the nature of the actual conflict and:

"(A) Except as provided in subparagraph (B) of this paragraph, [the public official must] refrain from participating as a public official in any discussion or debate on the issue out of which the actual conflict arises or from voting on the issue.

"(B) If any public official's vote is necessary to meet the requirement of a minimum number of votes to take official action, be eligible to vote, but not to participate as a public official in any discussion or debate on the issue out of which the actual conflict arises."

The statute requires that appointed members of boards and commissions disclose potential conflicts of interest before taking any action in their official capacity. A public official who has an actual conflict of interest is required to publicly disclose the conflict and to refrain from deliberations on the issue out of which the conflict arises, *and* to not participate in the vote, unless the member's vote is necessary to meet a minimum number of votes to take official action.

■ The Maritime Pilots Board is comprised of nine members, appointed by the Governor to four-year terms. Three of the members are public members, three are pilots and three are shipping industry members actively engaged in the ownership, operation or management of ocean-going vessels. ORS 776.105(2). Of the three pilot members, one must serve the Columbia River, one the Columbia River Bar, and one either the Coos Bay or Yaquina Bay Bar. The pilot must be experienced and actively involved in piloting. Shipping industry representatives must meet similar qualifications with respect to experience and activity within the industry. When the Board fixes pilotage fees, a quorum consists of seven members. ORS 776.105(5)(c). The three industry members of the Board happen to be members of PSOA, which represents shipping lines, the "consumers" of pilotage services.

Before petitioner intervened in this proceeding, PSOA, representing ship owners generally, had reached an agreement with state pilot groups, including CBPA, concerning pilotage fees. The pilot boat expense level approved in that agreement with regard to CBPA is the same item at issue in this proceeding. Petitioner contends that the three Board members representing the shipping industry have an interest in the approval of the agreed-to rates, because each of them is a member of PSOA, and PSOA has expressly indicated that a failure to approve the CBPA agreement could unravel the agreements made with other pilot associations, resulting in greatly increased time and expense in reaching a new rate structure with each. Additionally, petitioner claims that the three pilot members of the Board have a pecuniary interest in the outcome of the proceeding, because they are directly affected by the agreement between the pilot groups and PSOA, as the recipients of those rates.

The statutorily-mandated composition of the Board inherently creates situations where public roles and private interests come into conflict. The interests of ship owners and pilots are unlikely to be the same. Assuming self-interested behavior on the part of each, the pilots would hope to have fees set as high as possible without actually discouraging shipping traffic, while the ship owners would hope to have them set as low as possible without disrupting the availability of services. Indeed, those competing interests undoubtedly dictated the legislature's chosen make-up of the Board, with ship owners and pilots having equal power and the public members able to cast the deciding votes. By setting a quorum of seven, the legislature has required that at least one member of each of the affected interest groups participate in all rate proceedings.

The legislature has recognized that when commissions and boards are made up of members who represent competing interests, inherent conflicts will exist. Accordingly, it has excluded from the definition of a potential conflict of interest any potential conflict that

"arises out of an interest or membership in a particular business, industry, occupation or other class required by law as a prerequisite to the holding by the person of the office or position." ORS 244.020(7)(a).

We conclude that any interest that the shipping industry members and pilot members had in the outcome of the proceedings by virtue of the agreement was merely incidental to their membership in the shipping industry or maritime pilot profession, which are prerequisites to their membership on the Board. Accordingly, we conclude that those interests are not "potential conflicts" that require disclosure.

■ More specifically, it is claimed that Board member Davis has an actual conflict of interest, because he will benefit personally by the adoption of the proposed rates. Petitioner claims that Davis, who is a Coos Bay pilot, a member of CBPA and a shareholder in CBTC, played a major role in the outcome of the proceeding and that his ultimate decision to recuse himself from the vote could not undo the effect of his participation in the earlier deliberations. We agree. This proceeding determines the rates that CBPA will charge its customers for pilot services. Davis has a direct interest in the

rates approved by the Board, because his compensation is linked to those rates. He also has a direct interest in the outcome of the proceeding because of his ownership interest in CBTC. Although Davis disqualified himself from the actual voting, the record clearly reveals that he participated in significant deliberations concerning the methods that the Board would apply in evaluating CBPA's rate request. Those deliberations were perhaps more significant than the actual vote on the rate. The statutes implicitly recognize the significance of deliberations leading to a vote by permitting a Board member with an actual conflict of interest to vote if the member's vote is necessary to establish a quorum, but prohibiting the member from discussing or debating the issue out of which the conflict arises. Board member Davis had an actual conflict of interest and should have disclosed that conflict and disqualified himself from any discussion or debate or vote concerning the rate to be charged by CBPA.

■ We are not at liberty, however, to overturn the Board's decision solely because of Davis' failure to disclose a conflict. ORS 244.130(2) provides:

> "No decision or action of any public official or any board or commission on which the public official serves or agency by which the public official is employed shall be voided by any court solely by reason of the failure of the public official to disclose an actual or potential conflict of interest."

Thus, in the absence of other error, Davis' undisclosed conflict of interest is not a basis for reversal.

Petitioner makes a separate argument that the three shipping industry members and two remaining pilot members should have disqualified themselves from the proceedings because of "bias," on the ground that they had made up their minds to approve the settlement before the hearing. We note, initially, that it is petitioner's burden to prove that Board members were biased. *Teledyne Wah Chang v. Energy Fac. Siting Council*, 298 Or 240, 262, 692 P2d 86 (1984). Other than with regard to Davis, petitioner cites no evidence to support its claim that Board members had predetermined the rates that they would approve. The hearings officer who recommended to the Board the method to be used to determine expenses and the ultimate rate was an employee of the Public Utility Commission and there is no contention that he

had an interest in the outcome of the proceeding. His recommendation was accepted by the Board virtually without change. We again note that the legislature's chosen make-up of the Board is an implicit recognition that members representing different interest groups will bring their interests to the deliberation table, and that those interests are relevant and not a basis for disqualification in the absence of an actual conflict.[1]

■    We turn now to the merits of the rate case. Petitioner contends that the Board acted outside its discretion to establish reasonable and just rates when it refused to consider actual cost as a method for determining the cost of pilot boat service, and when it "arbitrarily allocated" costs between pilot boat service and ship assist service.

As stated earlier, the hearings officer considered four possible methods for determining pilot boat cost: the audit method, the actual cost method, the competitive bid method and the budget method. The hearings officer rejected the actual cost method, because CBTC does not own the least expensive type of boat needed to meet the demand for pilot boat services alone and does not own the fewest number of boats necessary to provide the service. The hearings officer reasoned that any attempt to use "actual cost" would necessitate use of hypothetical estimates of cost for the correct number of "single service" boats. Accordingly, the hearings officer concluded that the estimate would not be of actual cost at all, but merely another way of applying the budget method, which considers the cost of a hypothetically optimal service. The hearings officer explained:

"While the actual cost method has intuitive appeal, there are two complicating factors which prevent the board from actually using it:

"*Type of Boat.*    Ship assist services require a larger, more powerful (and more expensive) boat than pilot boat service. That difference would force use of the budget method to calculate the hypothetical cost of an appropriate pilot boat. At that point, the board would no longer be dealing with actual costs.

---

[1] Ratemaking, even though accomplished through contested case procedures, is a legislative, not a quasi-judicial, function. *American Can v. Lobdell*, 55 Or App 451, 461, 638 P2d 1152, *rev den* 293 Or 190 (1982). Legislators, as opposed to judges, are expected to bring a number of interests to the table.

"*Number of Boats.* The combination of ship assist and pilot boat services may require more boats than pilot boat service alone would require. That also forces use of the budget method to determine the appropriate number of boats."

Petitioner suggests that, contrary to the hearings officer's reasoning, the Board could have determined actual cost simply by determining CBTC's total actual costs and apportioning them to the percentage of time boats spend in each service. As the hearings officer implicitly recognized, however, that figure would not necessarily yield a reasonable expense for pilot boat service, because of the type of boat that CBTC uses and the number of boats that it uses. We conclude that the Board adequately explained its reason for disregarding the actual cost method for determining pilot boat expense.

■     Petitioner's remaining contention is that the Board abused its discretion when it arbitrarily "allocated" costs between pilot boat activities and non-pilot boat activities in determining a reasonable pilot boat expense. The Board expressly rejected actual cost as a method for determining reasonable pilot boat expense, so it did not need to allocate actual expenses between CBTC's pilot boat services and its ship assist and other services. Cost allocation might be necessary in a different context, however. Under the budget method, the Board estimates the cost of "optimal" boat service, and allocates that cost to CBPA's pilot boat expense. If, under that method, the optimal pilot boat was a dual purpose boat that could provide services other than pilot boat service, then it would be necessary to allocate to pilot boat expense only those costs reasonably attributable to pilot boat service. The Board referred to the hearings officer's memorandum explaining that if, by virtue of its multiple uses, a boat created two "opportunities," *i.e.,* was suitable for two purposes, then the Board could allocate 50 percent of joint costs to each service. The hearings officer explained that, under any scenario, allocation of joint costs is a difficult and "somewhat arbitrary" process, to be determined by the Board in its reasonable judgment. The Board said in its order:

"When the Board made its methodology decision it recognized that there is no single 'correct' method for allocating joint costs. The Board decided to avoid potential disclosure of

Coos Bay Towboat Company trade secrets by rejecting allocation on relative use. The Board decided instead to look at the opportunities which acquisition of an asset creates and assign an equal percentage of the joint costs to each opportunity."

Later in its order, when considering the cost of a hypothetical boat that would be able to provide both pilot boat service and ship assist service, the Board said that it "would allocate 50 percent of joint costs to each service." Petitioner focuses on that language as the basis for its contention that the Board "allocated" costs and that it did so arbitrarily, without reference to the actual uses that CBTC makes of its boats. Although the Board discussed the issue of allocation in different contexts, it is clear from reading the Board's order in its entirety that it made no allocation of costs, per se. The Board reasoned that reasonable pilot boat expense could best be determined by first using the budget method to estimate the cost of "optimal" service. It found that "optimal" service would be provided by two single-use pilot boats and determined the average annual cost of operating that service. For purposes of comparison, the Board noted that the estimated cost of two single-use boats was less than half the cost of dual-purpose boats comparable in use to those owned by CBTC.

The Board calculated what it estimated to be the cost for a pure pilot boat service, $845,213. It then reasoned that CBTC's ability to provide other services as well was an efficient use of boats and crew, and that that efficiency should be passed on to the public in the form of lower rates. It thus reduced the expense estimated under the budget method by considering what the evidence showed that CBTC would charge for pilot boat service. It said:

"To ensure that the public shares the economic benefits of a dual operation, the Board will not set rates at a level which would recover the cost of a hypothetical pure pilot boat operation. Instead, the Board will recognize that the dual operation exists and set rates at a level which ensures that pilot boat service covers its variable costs and makes a reasonable contribution to joint costs. A reasonable contribution, in the Board's view, would not exceed the compensation Coos Bay Towboat Company would receive if the pilots paid market rates for use of a pilot boat. In this case, the $514,020 figure that Coos Bay Towboat Company would

charge for 659 jobs at its minimum rate still exceeds the $497,200 which the pilots request in their petition."

In essence, the Board used the budget approach as a means to test the reasonableness of the requested expense level. Having determined that the amount requested was far less than the cost of a hypothetical pure pilot boat service, it concluded that the request was reasonable and allowed the pilots' requested pilot boat expense.

An underlying concern in this case appears to be whether, however reasonable the Board's cost estimate might be, CBTC should be required to reveal its actual costs of doing business. CBPA asserts that the data is not required to be disclosed by law, and that its disclosure would reveal confidential information. Petitioner is certain that that data will reveal that CBTC's costs are low and that it is making an excessive profit on its pilot boat service. It contends that the confidentiality of CBTC's financial data can be maintained by a protective order. We are persuaded that there is no legal requirement that CBTC disclose its cost of doing business, unless that data is subpoenaed by the Board.

We have held in another case that the services provided by CBTC to CBPA are not part of pilotage, and that income from pilot boat ownership need not be considered by the Board in setting pilotage fees. *Portland Steamship Operators v. Coos Bay Pilots*, 39 Or App 513, 516, 592 P2d 1060 (1979). We conclude, further, that it was within the Board's discretion to determine whether the Board needed CBTC's financial data to reach a reasonable estimate of CBPA's pilot boat expense and that the Board acted within its discretion when it chose not to look at evidence of actual cost but to use the budget method as a means of determining whether the requested expense level was reasonable. We hold that the Board's approval of the requested pilot boat expense is supported by substantial evidence.

Affirmed.